Lawrence R. ALBERTI, et al.

v.

Johnny KLEVENHAGEN, et al.

Civ. A. No. 72–H–1094.

United States District Court,
S.D. Texas,
Houston Division.

April 28, 1987.

Jim Oitzinger and Gerald M. Birnberg, Williams, Birnberg & Andersen, Houston, Tex., for plaintiffs.

Lupe Salinas, Asst. Co. Atty., Houston, Tex., for Klevenhagen.

Roderick Lawrence, Asst. Dist. Atty., Houston, Tex., for Comrs.

## ORDER APPOINTING
## SPECIAL MASTERS

CARL O. BUE, Jr., District Judge.

Consistent with the dictates of the Fifth Circuit Court of Appeals in its opinion of June 4, 1986, 790 F.2d 1220, this Court has considered and hereby grants the Motion of Plaintiffs' Attorneys James T. Oitzinger and Gerald M. Birnberg to withdraw from service in the Office of the Ombudsman. Further, in view of the appointment of Special Masters to assist the Court as hereinafter outlined, the Office of the Ombudsman is hereby abolished as of this date.

In lieu of the Office of the Ombudsman, the Court hereby appoints three well qualified jail experts—a Special Fact Finding Master and two Monitor-Assessors (one with expertise in medical areas and the other with expertise in jail condition matters generally) to perform and discharge the functions hereinafter described. The parties, through their respective attorneys, agree with and consent to these appointments.

■ The Court has determined that the law and the record in this case support these appointments. Further, it is the Court's belief that compliance efforts will be enhanced by the appointment of masters and that the conclusion of the case may be expedited thereby. The Court has determined that there is a need for the experts and that the appointments hereinafter made are justified by the facts, the law and the exceptional circumstances present in this case.

The Court concludes that the appointment of the hereinafter designated Fact Finding Special Master, Medical Monitor-Assessor and Jail Monitor-Assessor and the implementation of the hereinafter contained remedial procedures are justified under Rule 53 of the Federal Rules of Civil Procedure and the applicable law. Pursuant to the inherent powers of a court of equity to fashion remedies appropriate to the attainment of the relief sought to be achieved,

It is accordingly and therefore,

### Section I.

■ ORDERED that Mr. Michael Keating of Providence, Rhode Island, Mr. Amos E. Reed of Salem, Oregon and Dr. Armond H. Start of Oklahoma City, Oklahoma are hereby appointed as Special Masters in this case, pursuant to Rule 53(b) of the Federal Rules of Civil Procedure and by virtue of the inherent powers of this Court as a court of equity.[1] Mr. Keating shall be designated as and shall serve as the "Fact Finding Special Master" and shall conduct fact finding hearings. He shall additionally coordinate, supervise and direct the work of the Monitor Assessors and be primarily responsible for performing and discharging the day-to-day functions, activities and duties of the masterships.

■ Dr. Armond H. Start shall be designated as and shall serve as the "Medical Monitor-Assessor" and shall focus his activities primarily on matters relating to medical and health care issues in the jails, including the medical staff, facilities and health care program of the Harris County detention facilities, under and pursuant to the supervision, direction and coordination of the Fact Finding Special Master.

■ Mr. Amos E. Reed shall be designated as and shall serve as the "Jail Monitor-Assessor" and shall focus his activities primarily on matters relating to other issues involving jail conditions, under and pursuant to the supervision, direction and coordination of the Fact Finding Special Master.

### Section II.

■ It is further ORDERED that the Fact Finding Special Master, the Medical Monitor-Assessor and the Jail Monitor-Assessor shall generally and collectively, under the supervision and coordination of the Fact Finding Special Master, monitor Defendants' efforts in complying with and fulfilling the mandate and requirements of

---

1. The curricula vitae of Mr. Keating, Mr. Reed and Dr. Start are attached hereto as Exhibits 1, 2 and 3.

the Consent Judgment entered in this case on February 4, 1975, as modified and supplemented by other Orders entered in this case by this Court, including particularly, without limitation, the December 16, 1975 Order and the December 18, 1984 Order (hereinafter collectively referred to as the "Orders"), and shall report to the Court regarding compliance. Without limiting the scope of the foregoing duties and responsibilities, it is specifically ORDERED that the duties of the Fact Finding Special Master, in collaboration with the Medical Monitor-Assessor and the Jail Monitor-Assessor, shall include the following:

1. To conduct a thorough assessment, examination and investigation into the totality of the conditions of confinement existing in the Harris County detention facilities and to determine whether such conditions comply with State and Constitutional standards and the Orders of this Court;

2. To submit to the Court no later than ninety (90) days after the date of his appointment an initial comprehensive written report concerning the conditions of incarceration in the Harris County detention facilities and the state of compliance by the Defendants with the Consent Judgment, the December 16, 1975 Order, the December 18, 1984 Order and any other relevant Orders entered in this case by the Court (hereinafter collectively referred to as the "Orders"). The initial report shall specifically address among other matters the following:

A. *Capacity Determinations*

(1) the maximum capacity of each Harris County detention facility, taking into consideration:

(a) day and night use of the detention facilities

(b) weekend sentences

(c) classification needs and requirements

(d) available staff, and

(e) any other relevant considerations.

(2) whether the support services and facilities can sufficiently accommodate the determined capacity;

(3) whether the medical staff and facilities are sufficient to provide adequate medical care and screening for all inmates;

(4) factors contributing to the fact that the detention facilities are housing inmates in excess of the maximum capacity;

(5) efforts of the defendants in directly or indirectly alleviating the effects of housing inmates in excess of the maximum capacity of the detention facilities;

(6) the totality of conditions which exist as a result of the housing of inmates in excess of the maximum capacity of the detention facilities;

(7) local community resources available and willing to assist in improving jail conditions, including those specifically involved in

(a) medical screening and

(b) medical treatment

B. *Compliance With Orders*

(1) any areas of non-compliance with the Orders noted, found or observed by the Special Masters, and

(2) if full compliance with the Orders has not been achieved, specific recommendations for achieving full compliance with the Orders so as to bring about within a minimum amount of time jail conditions which meet State and Constitutional standards, and

(3) such other matters as the Fact Finding Special Masters may deem appropriate to include within the report.

C. *Inspection and Investigation*

(1) Thereafter, to inspect from time to time each detention facility operated by the Defendant Sheriff subject to the limitations and provisions of Section VII of the instant Order.

(2) Subject to the limitations hereinafter specified in Section V below, to receive oral and written complaints about, investigate, and, where possible, to recommend resolution of systemic problems (as opposed to what appear to be merely isolated individual complaints) involving constitutional violations with respect to conditions of incar-

ceration within the Harris County detention facilities (including matters and information brought to the attention of the Fact Finding Special Master or the Monitor-Assessors by inmates or by counsel for either party).

### D. *Reporting*

(1) To evaluate and report to the Court on a quarterly basis the state of compliance with the Consent Judgment, the December 16, 1975 Order, the December 18, 1984 Order and all other Orders entered in this case by the Court and to report on the state of conditions of confinement within the Harris County detention facilities, as well as any other matters thought by the Fact Finding Special Master and the Monitor to be appropriate;

(2) To make recommendations generally on the implementation of the Orders;

(3) To report to the Court apparent violations of any of the Court's Orders entered in this case;

(4) To advise the Court concerning any proposed modifications to the Consent Judgment or to any Orders entered by the Court.

### E. *Review of Construction Plans*

To review plans for construction of new jail or detention facilities and renovation of existing facilities during the development of such plans and before the plans are finalized. Moreover, to report to the Court on the constitutional implications of such construction plans as they affect the rights of inmates housed therein. Such considerations would include, for example, rights to adequate medical care and attention, right to adequate security, and rights to reasonable recreation, visitation, appropriate classification and access to lawyers and law libraries. Further, to report to the Court any design deficiencies, flaws or inadequacies noted by the Fact Finding Special Master, the Medical-Assessor or the Jail Monitor-Assessor which would have a materially adverse effect on the constitutional rights of inmates, or on Defendants' compliance with Court Orders, if such construction plans were consummated;

### F. *Other Matters*

(1) To communicate with counsel for the parties from time to time in his discretion (including ex parte) concerning any matters as to which the Fact Finding Special Master deems such communications to be appropriate in understanding the issues and performing his duties as a Master.

(2) To perform such other duties as the Court may from time to time hereafter assign.

### Section III.

■ Without limiting the scope of the duties and responsibilities of the Medical Monitor-Assessor and the Jail Monitor-Assessor set forth generally hereinabove, it is specifically ORDERED that the duties of the Medical Monitor-Assessor and the Jail Monitor-Assessor (which duties shall be discharged under the supervision, direction and coordination of the Fact Finding Special Master) shall include the following:

### 1. *General Duties*

A. To assist the Fact Finding Special Master generally in any manner requested or directed in order to effect discharge of the duties of the Fact Finding Special Master as set forth hereinabove;

B. To participate fully in and assist the Fact Finding Special Master as directed in the examination and investigation of conditions of confinement in Harris County detention facilities, the preparation and submission of comprehensive reports to the Court, the formulation of recommendations, the continued inspection of facilities, and the review of construction and renovation plans, described hereinabove; further, to assist in the performance of such other duties of the Fact Finding Special Master (other than the conduct of evidentiary hearings) as the Fact Finding Special Master may delegate to the Medical Monitor-Assessor or the Jail Monitor-Assessor, all subject to the provisions and limitations of Section VII, *infra,* in this Order.

### 2. *Reporting*

A. To report to the Court apparent violations of any of the Court's orders entered in this case; and

B. To present data, information, findings, observations, reports and recommendations to the Fact Finding Special Master and to testify with regard thereto at any hearings conducted by the Fact Finding Special Master pursuant to the powers granted to the Fact Finding Special Master hereinafter.

### 3. *Other Matters*

A. To communicate with counsel for the parties from time to time (including ex parte) concerning any matters as to which such monitor deems such communication to be appropriate in the performance of his duties, or such communication has been directed or requested by the Fact Finding Special Master; and

B. To perform such other duties as the Court may from time to time hereafter assign or designate.

### Section IV.

■ It is further ORDERED that, in order to enable the Fact Finding Special Master and the Monitor-Assessors to carry out their duties, they shall have the following powers and authority, which powers and authority shall be exercised pursuant to the direction, supervision and coordination of the Fact Finding Special Master:

1. The Fact Finding Special Master and the Monitor-Assessors are authorized to select and hire, with prior approval of the Court (after notice to Defendants and reasonable opportunity for Defendants to be heard), such assistant(s) as may be required to aid them in performing their duties, and with prior approval of the Court (after notice to Defendants and reasonable opportunity for Defendants to be heard), the Fact Finding Special Master and/or the Monitor-Assessors may also consult with and hire appropriate independent specialists. The Defendant Harris County Commissioners shall make available to the Fact Finding Special Master and the Monitor-Assessors adequate conveniently located offices, equipment (including telephones), supplies, photocopying facilities and appropriate stenographic, secretarial and clerical assistance, as reasonably required and needed;

2. The Fact Finding Special Master and the Monitor-Assessors shall have complete, unrestricted, unimpeded and unlimited access to the premises of all Harris County detention facilities at any and all times without prior notification to anyone, including the right to photograph any such place or part thereof (with due regard for the privacy of and any objections of any inmates indentifiably present in any such photographs); provided, however, that without express prior written authorization from the Court, no such Fact Finding Special Master or Monitor-Assessor shall show or display such photographs to anyone other than the Court, the Court's law clerks, the Fact Finding Special Master, the Monitor-Assessors, the personnel employed by the Fact Finding Special Master or the Monitor-Assessors in this case, and the attorneys for the parties. In order to facilitate the Fact Finding Special Master's and the Monitor-Assessors' access to the jail facilities, Defendants shall provide each of them with proper official identification authorizing them to have complete access to and freedom of movement within the jail facilities and premises at all times, without securing prior approval and without unduly cumbersome sign-in or check-in procedures.

3. The Fact Finding Special Master and the Monitor-Assessors shall have complete, unrestricted and unlimited access to, and right to copy, all files, statistics, plans, drawings, reports, data and records relating to constitutional issues of conditions of confinement in the Harris County detention facilities including matters involving the number of inmates, their security needs and concerns, and their medical care;

4. The Fact Finding Special Master and the Monitor-Assessors shall be authorized to conduct unimpeded confidential interviews with any County employee possessing relevant information, any member of the Sheriff's staff or any inmate. They shall have the unrestricted right to tape-record any interview, and shall have the right to attend any institutional meetings or proceedings which are not privileged meetings between attorney and client; and

5. The Fact Finding Special Master shall be empowered to hold hearings and to cause subpoenaes to be issued compelling the attendance of witnesses, including, without limitation, inmates, jail staff and personnel, county employees having relevant information, and others, and to take testimony under oath at such hearings.

 Should the Fact Finding Special Master decide to conduct hearings as to any particular matters, such hearings must be conducted in a procedurally fair manner, with timely notice to all parties of the date, time, place and subject matter to be considered at such hearing(s), and a fair opportunity for all parties to prepare and participate in such hearings and be heard therein including a reasonable opportunity to present such relevant testimony, evidence or information as such party may wish to present. A record of those hearings must be maintained either by transcription or by stenographic recording. The reports, findings, recommendations, or conclusions resulting from such hearings shall be presumed to be correct and such findings shall not be set aside unless clearly erroneous. Any report, finding, recommendation, conclusion or other writing filed by the Fact Finding Special Master which is not based on such a procedurally fair hearing shall not be accorded any presumption of correctness, nor shall the "clearly erroneous" rule apply thereto.

 The Fact Finding Special Master shall serve on counsel for all parties copies of all reports, findings, conclusions, recommendations, and other writings filed with the Court. Within fourteen (14) days after having been served with a copy of any such report, finding, conclusion, recommendation, or other writing, the parties may file specific written objections thereto, therein specifying with particularity the precise matter to which such party objects and setting forth with particularity the basis of such objection. Regardless of whether or not such report, finding, recommendation, conclusion or writing was based upon evidence adduced at a hearing, any objection by any party to any portion of any report, finding, conclusion, recommen-

dation, or other writing filed by the Fact Finding Special Master will be deemed to be waived unless objected to in writing in the manner and within the time hereinabove provided. The Court may adopt any such unobjected to portion of any such report, finding, conclusion, recommendation or other writing filed by the Fact Finding Special Master as the Court's findings of fact and/or conclusions of law without further proceedings of any kind. If timely objection is made in the manner herein prescribed, the Court shall handle such matter as the circumstances and the law require.

### Section V.

 Neither the Fact Finding Special Master nor the Monitor-Assessors shall have any authority to intervene in daily jail operations. Further, the Fact Finding Special Master and the Monitor-Assessors shall not go beyond superintending compliance with the Court's orders and decrees or otherwise convert the masterships process into a surrogate forum for new civil rights actions. The Fact Finding Special Master and the Monitor-Assessors are not to function as inmate advocates, nor are they to be a roving federal district court. Additionally, they are at all times to conduct themselves consistent with the letter and spirit of the role of special masters as expressed by the Fifth Circuit Court of Appeals in its opinion of June 4, 1986.

 It is further ORDERED that the Defendants shall prominently post notices throughout the Harris County detention facilities stating that the Court has appointed a Fact Finding Special Master and two Monitor-Assessors who will visit the jail and talk to staff members or inmates. The notices shall emphasize that the Fact Finding Special Master and the Monitor-Assessors' function is only to aid the Court in its determination of the constitutional conditions in the detention facilities, and that their appointment is not a substitute for the regular grievance and disciplinary procedures. The notice shall also state that any written communication may be placed in a sealed envelope and will be delivered to

the Fact Finding Special Master or Monitor-Assessor without being inspected or read by jail officials. The procedures to be followed for the submission of inmate complaints shall be set up by the Fact Finding Special Master and Monitor-Assessors.

## Section VI.

It is further ORDERED that the costs and expenses of the Fact Finding Special Master and the Monitor-Assessors in carrying out the duties hereinabove described shall be taxed against the Defendants as part of the costs of this litigation. The Fact Finding Special Master and the Monitor-Assessors shall maintain records of the time expended and expenses incurred by them in discharging their duties and functions hereunder and shall receive interim compensation for their services and reimbursement for their expenses every thirty (30) days based upon itemized statements of fees and expenses submitted by them setting forth the time expended and expenses incurred. Within thirty (30) days after the date of this Order, and after consultation with the Monitor-Assessors, the Fact Finding Special Master shall submit to the Court a compensation proposal. The Fact Finding Special Master shall also forward copies thereof to counsel for the parties setting forth (a) hourly rates of compensation proposed to be paid the Special Masters, (b) a proposed procedure for assuring prompt payment to the Special Masters of compensation, and (c) a proposed sum of money to be deposited into the Registry of the Court as a fund from which prompt payment of the Special Master's fees and expenses can be made. The Defendants will have seven (7) days thereafter to file any written comments they may choose with regard thereto and the Court will thereafter enter a supplemental Order specifying the manner, rates of compensation, and procedure for payment of fees and expenses to the Special Masters and the amount of funds to be deposited by the Defendants into the registry of the Court to assure prompt payment of compensation to the Special Masters.

## Section VII.

Unless the Court sooner relinquishes jurisdiction over this case or unless a successor judge elects to terminate the masterships at any time, the appointments shall stay in effect and the Fact Finding Special Master and Medical Monitor-Assessor and Jail Monitor-Assessor shall continue to perform the duties enumerated in this order. When the Defendants shall have fully complied with all orders entered in this case, including the Consent Judgment, the December 15, 1975 Order, the December 18, 1984 Order, and all other Orders entered herein, and such full compliance has continued for a sufficient length of time to make lapse into noncompliance improbable, the Court, after appropriate proceedings, will enter an order terminating the appointments.

The foregoing provisions notwithstanding, it is understood by all parties that the Court will be transferring this case to a successor judge at the earliest practicable time prior to September 1, 1987. This Court does not mean or intend to bind such successor judge to the actions or appointments hereinabove undertaken. All parties understand and agree that the successor judge may well determine to terminate or dissolve the masterships at anytime, to decrease or increase the number of masters and/or the staff of the masterships, to replace the hereinabove appointed masters with masters of the successor judge's choosing, or otherwise to modify or amend the actions effectuated by this Order. It is expected and anticipated that the successor judge will evaluate the appropriateness of continuing the masterships at a time convenient to the Court after the transfer of the case, and all interested parties understand, and are hereby put on notice, that the appointments hereinabove made could be terminated at such time or could be re-confirmed or merely continued in effect. Other than as set forth in the immediately preceding paragraph, however, the masterships shall not be terminated or be dissolved merely because the successor judge omits such reconfirmation within a particular period of time. Such masterships shall continue in full force and effect as provided

hereinabove until entry of a formal Order by the Court dissolving or terminating them in accordance with law.

### Section VIII.

Nothing in this Order shall be construed or deemed in any way to limit, diminish or reduce the responsibilities which the Plaintiffs' counsel have as class counsel, including specifically, without limitations, responsibilities which Plaintiffs' counsel have to (i) monitor, seek, and secure implementation of, compliance with and enforcement of the Court's Orders, (ii) protect fully the effectiveness and full scope of relief afforded the Plaintiff class, (iii) report to the Court violations of the Court's orders, (iv) undertake measures necessary to enforce the remedies ordered, and (v) otherwise seek to achieve those matters which are perceived by Plaintiffs' counsel to be in the best interest of the Plaintiff-class, and Plaintiffs' counsel shall continue to discharge those functions and responsibilities ethically and professionally.

### EXHIBIT NO. 1

### CURRICULUM VITAE

### J. MICHAEL KEATING, JR.

## EDUCATION

J.D., Georgetown University Law School, Washington D.C., 1973

M.A., History, New York University, 1962.

B.A., Political Science, Holy Cross College, Worcester, Massachusetts, 1960.

## EXPERIENCE

Tillinghast, Collins & Graham, Providence, R.I.; Counsel, Director of Alternative Dispute Resolution (ADR) Services; 1985–present.

Mr. Keating is a mediator, arbitrator, federal court master and national consultant in conflict management and corrections. He directs the ADR services of Tillinghast, Collins & Graham, a large Providence, R.I. law firm, which includes the provision of third-party services and a wide range of preventive legal assistance. His direct mediation practice includes interpersonal disputes, intra- and inter-corporate conflicts, insurance liability cases and state and national policy issues. He hears cases in the public and private sector as a member of the American Arbitration Association's labor panel of arbitrators and is a member of the Association's commercial panel. He teaches as a visiting professor at Boston University Law School and also serves as a part-time special master in a variety of cases for the United States District Court for Rhode Island.

Conflict Management Resources, Inc. (New York City): Chairman; Institute for Conflict Management: Executive Vice-president; 1982–1985.

Mr. Keating was the co-founder of Conflict Management Resources (CMR), with which he helped mediate budgeting priorities for human services in Connecticut in an innovative intergovernmental negotiation process in 1983–84. With CMR, he trained community mediators and delivered advanced training courses in mediation for a variety of organizations, including the Community Relations Service of the U.S. Department of Justice and Harvard Law School. For the Institute of Conflict Management, Mr. Keating authored a study on accountability among private providers of publicly funded social services.

Federal District Court for the District of Rhode Island, 1978–1982. Position: Special Master.

Appointed by Judge Raymond J. Pettine as Special Master to oversee compliance with judicial decrees in two cases involving adult and juvenile corrections in Rhode Island, Mr. Keating conducted compliance reviews and hearings, participated in court proceedings, prepared draft opinions and published frequent reports. He also participated in the Department of Corrections' basic planning and budgetary activities on behalf of the court, helped procure federal funds to underwrite physical renovations and the development of new programs, reviewed departmental and institutional policies and procedures and monitored major construction projects.

University Research Corporation, Washington, D.C., 1977–78. Position: Project Director.

Directed the initial training and coordination of the three model Neighborhood Justice Centers established by the Department of Justice in Atlanta, Kansas City and Los Angeles to test the feasibility of the use of community people trained in mediation and arbitration techniques to resolve minor criminal and civil disputes.

Center for Community Justice, Washington, D.C., 1971–77. Position: Deputy Director.

Played a key role in the Center's development of innovative conflict resolution mechanisms in a variety of public and private institutions characterized by disparity in power between clients and the institutions, including prisons, schools, juvenile correctional institutions and mental hospitals.

## OTHER EXPERIENCE

As a United States Air Force Officer (1963–1970), directed the production of over 1500 intelligence reports annually in Tokyo, Japan and served as Operations Officer of a special activities intelligence gathering unit in Seoul, Korea. Taught U.S. History (part-time) for the University of Maryland, Far East Division, while stationed in Seoul and Tokyo. 1965–1970.

## SOME REPRESENTATIVE PUBLICATIONS

*The Anatomy of a Legal Innovation: The Use of Alternative Dispute Resolution (ADR) Techniques in the New Jersey Court System* (with M. Shaw), prepared for the New Jersey Administrative Office of the Courts, June, 1986.

"Alternative Dispute Resolution: An Evolving Legal Specialty," *Rhode Island Bar Journal*, February, 1986.

*Seeking Profit in Punishment: The Private Management of Correctional Institutions*, prepared for the American Federation of State, County and Municipal Employees (AFSCME), October, 1985.

"Alternatives to the Courts," *The Providence Journal-Bulletin*, September 10, 1985.

*Public Ends and Private Means: Accountability among Private Providers of Public Social Services*, prepared for the National Institute for Dispute Resolution, February, 1984.

*An Introduction to Mediation: A Manual for Beginning Mediators* (with Joseph B. Stulberg), prepared for Conflict Management Resources, Inc., September, 1983.

*Handbook for Special Masters: Judicial Version*, prepared for the National Institute of Corrections, May, 1983.

"Re-Humanizing Our Institutions: A Correctional Prescription," *The Journal of Intergroup Relations*, Summer, 1982.

*A Personal Account of the Adventures of a Master*, prepared for the Federal Judicial Center, October, 1981.

*Recommended Standards for Training and Career Development of Correctional Employees*, prepared for the American Federation of State County and Municipal Employees (AFSCME), July, 1981.

*Contracting for Services in Jails* (with J. Dahl and S. Steinberg), prepared for the National Institute of Corrections, March, 1981.

"A Journalist Looks at Crime," a review of Charles Silberman's *Criminal Violence, Criminal Justice*, 89 *Yale Law Journal* 1017, April, 1980.

*Grievance Procedures under Section 504 of the Rehabilitation Act*, a report prepared for the Ford Foundation and the Office of Civil Rights of HEW, July, 1977.

"The Justice Model Applied: A New Way to Handle the Complaints of California Youth Authority Wards," *Loyola of Los Angeles Law Review*, January, 1977.

*Improved Grievance Procedures*, published by the American Bar Association, June, 1976.

"Arbitration of Inmates' Grievances: The Timely Arrival of an Old Idea in Corrections," *Arbitration Journal*, September, 1975.

*Grievance Mechanisms in Correctional Institutions* (with V. McArthur, M. Lewis, K. Sibelius, L. Singer), prepared for the National Institute of Justice of LEAA, May, 1975.

*Seen But Not Heard: A Survey of Grievance Mechanisms in Juvenile Correctional Institutions* (with K. Gilligan, V. McArthur, M. Lewis, L. Singer), prepared for the Institute of Judicial Administration and the American Bar Association, October, 1974.

"Prison Violence, Prison Litigation: Is There a Better Way?" (with L. Singer), *Crime and Delinquency,* July, 1973.

MISCELLANEOUS

*Consultantships*

American Arbitration Association

American Federation of State County and Municipal Employees

Center for Community Justice, Washington, D.C.

Community Relations Service, U.S. Department of Justice

Federal Judicial Center, Washington, D.C.

Harvard University Law School

National Institute for Dispute Resolution

New York City Department of Corrections

New York City Department of Juvenile Justice

University Research Corporation, Washington, D.C.

University of Rhode Island

EXHIBIT NO. 2

CURRICULUM VITAE

NAME: Armond H. Start, M.D., M.P.H.

BIRTHDATE: May 2, 1931

BIRTHPLACE: Grand Rapids, Michigan

WIFE: Judy

CHILDREN: Susan —age 29
Lisa —age 28
Carrie —age 26
David —age 21

EDUCATION AND TRAINING

| 1953 | A.B. | Calvin College Grand Rapids, Michigan |
| 1957 | M.D. | University of Michigan Ann Arbor, Michigan |
| 1957–58 | Internship | Butterworth Hospital Grand Rapids, Michigan |
| 1960–62 | Pediatric Residency | University of Oklahoma Children's Memorial Hospital |
| 1976–77 | M.P.H. | University of Oklahoma College of Health |

MILITARY SERVICE

1958–60 Eglin Air Force Base, Florida

PROFESSIONAL EXPERIENCE

1962–63 Chief Resident in Pediatrics, Children's Memorial Hospital, Oklahoma City, Oklahoma

1963–75 Private Practice of Pediatrics Oklahoma City, Oklahoma

| | |
|---|---|
| 1975–77 | Director, Division of Communicable Disease Control, Oklahoma State Department of Health |
| 1977–83 | Medical Director Oklahoma State Department of Corrections |
| 1983 | Medical Director Texas Department of Corrections |

PAST AND PRESENT

PROFESSIONAL SOCIETIES AND ORGANIZATIONS

Associate Clinical Professor of Pediatrics,
University of Oklahoma College of Medicine

American Medical Association
Texas Medical Association
Oklahoma State Medical Association (Secretary-Treasurer 1977–83)

Oklahoma County Medical Society (Secretary-Treasurer 1976–77)
Tri-County Medical Society
American Academy of Pediatrics

Professional Convention Management Association

Oklahoma City Clinical Society (President 1972)
Oklahoma Public Health Association
The American Board of Pediatrics

National School Board Association (1973–80)

Commission on Accreditation for Corrections—Auditor
American Correctional Association
American Public Health Association
American Correctional Health Services Association (Board of Directors)

HONORS AND AWARDS

| | |
|---|---|
| 1970 | The Robins Award for Outstanding Community Services by the Oklahoma State Medical Association |
| 1970 | The Oklahoma County Medical Society Public Health Award |

PROFESSIONAL AND COMMUNITY ACTIVITIES

| | |
|---|---|
| 1973–80 | Oklahoma City Board of Education (Vice-President—1976, President—1977) |
| 1971–73 | Steering Committee, Oklahoma Medical Summit |
| | Numerous committees of the Oklahoma County Medical Society, Oklahoma State Medical Association and Oklahoma City Board of Education |
| 1970 | Director of Statewide "Rub-Out-Rubella" Campaign |
| 1970–77 | Director of Medical Education Presbyterian Hospital, Oklahoma City, Oklahoma |
| 1980–83 | Medical Director, Oklahoma Foundation for Peer Review |
| 1980–83 | Physicians Liability Insurance Company of Oklahoma (Secretary-Treasurer 1980–83) |
| 1983 | New Life Church—Vice Chairman Board of Directors, Spring, Texas |

I have been an auditor for the Commission since 1979. I have been a member of the audit team for the following listed institutions:

1. California Medical Facility (2)—Vacaville, California.
2. Deuel Vocational Institution—Tracy, California.
3. Menard Correctional Center—Menard, Illinois.
4. Menard Psychiatric Center—Menard, Illinois.
5. Medical Center for Federal Prisoners (2)—Springfield, Missouri.
6. Lawtey Correctional Institution—Lawtey, Florida.
7. Reception and Medical Center—Lake Butler, Florida.
8. California Men's Colony—San Luis Obispo, California

I have been a health care consultant and evaluator of medical services at the following institutions:

1. Harris County Jail—Houston, Texas.
2. Tulsa County Jail—Tulsa, Oklahoma.
3. Jackson State Prison—Jackson, Michigan.
4. Michigan State Reformatory—Ionia, Michigan.
5. Michigan Branch Prison—Marquette, Michigan.
6. Hawaii State Prison System—Honolulu, Hawaii.

EXHIBIT NO. 3

BIOGRAPHICAL DATA: Amos E. Reed
2840 Holiday Drive S.
Salem, Oregon 97302 Telephone: (503) 362–3308
Wife, Dorothy, six children

CORRECTIONS CONSULTANT, EXPERT WITNESS, LECTURER

EDUCATIONAL BACKGROUND:

M.S. (Education—Social Science) Northern Illinois University
A.B. (Biology) McKendree College
Many special courses, seminars and retreats as teacher/student

PRIOR EMPLOYMENT:

7/81 to 6/86 Secretary, Washington State Department of Corrections
1/81 to 7/81 Director, Adult Corrections Division, State of Washington
1/77 to 1/81 Secretary, North Carolina Department of Corrections
4/76 to 1/77 Deputy Secretary, Florida Department of Corrections
7/71 to 4/76 Administrator, Oregon Division of Corrections
7/69 to 7/71 Associate Administrator, Oregon Division of Corrections

Also held positions as Superintendent of: Oregon Correctional Institution; Oregon State Training School for Boys; Illinois State Training School for Boys; Industrial School at Sheridan, Illinois; Diagnostic Center at St. Charles, Illinois; Elementary School System, Illinois; County Office of Public Welfare, Illinois; Village President at Millington, Illinois.

PROFESSIONAL ORGANIZATIONS AND SERVICE CLUBS: (Examples)

Past President—American Correctional Association (1980 to 1982)
Past Member—Commission on Accreditation for Corrections

Past President—National Association for State Correctional Administrators
Past President—National Association of Training Schools and Juvenile Agencies
Chairman—Governor's Interagency Criminal Justice Work Group, Washington
Member—Washington Job Training Coordinating Council
Member—Washington Technical Advisory Committee, Employment and Training Council
Member—Washington Criminal Justice Training Commission
Member—Washington Advisory Council on Criminal Justice Services
Member—Washington Corrections Standards Board
Member—Washington Institutional Industries Board of Directors
Member—Washington Sentencing Guidelines Commission
Administrator—Washington Agreement on Detainers
Past President—Marion-Polk Counties, United Good Neighbors, Salem, Oregon
Past President—Rotary Club of Woodburn, Oregon