**In re William P. CLEMENTS, et al., Petitioners.**

**No. 89–2706.**

United States Court of Appeals, Fifth Circuit.

Aug. 11, 1989.

John B. Worley, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Robert Ozer, Asst. Atty. Gen., Austin, Tex., for U.S.

Harold M. Streicher, Roderick Q. Lawrence, Lisa S. Rice, Asst. Harris County Attys., Houston, Tex., for Johnny Klevenhagem, Sheriff of Harris County.

James Oitzinger, and Gerald M. Birnberg, Williams, Birnberg & Anderson, Houston, Tex., for L. Alberti, et al.

Before POLITZ, GARWOOD, and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

This proceeding is a petition for writ of mandamus. Petitioners are William P. Clements, Governor of the State of Texas, James Lynaugh, Director of the Texas De-

partment of Corrections ("TDC," the Texas state agency responsible for the Texas state prison system), the members of the Texas Board of Corrections (the governing body of TDC),[1] all in their respective official capacities, and the State of Texas, each appearing herein by and through the Attorney General of Texas, Jim Mattox.

This petition arises from the case of Lawrence R. Alberti, et al. v. the Sheriff of Harris County, Texas, et al., civil action No. 72–H–1094 on the docket of the United States District Court for the Southern District of Texas, Houston Division, a long-pending prisoner class action suit, now presided over by Chief Judge James DeAnda, in which complaint is made of allegedly unconstitutional conditions of confinement in the Harris County, Texas jail.[2] Our individual petitioners, in their respective official capacities, have been made third-party defendants in *Alberti* to the third-party complaint therein of the *Alberti* defendants, the sheriff, county judge, and county commissioners of Harris County, Texas, who allege that the third-party defendants are responsible for overcrowding in the Harris County jail because of TDC's refusal to accept sufficient numbers of convicted felons confined in the Harris County jail and ready for transfer to TDC. The *Alberti* defendants/third-party plaintiffs seek judg-ment of the *Alberti* district court ordering the third-party defendants, our individual petitioners, "to immediately remove from the Harris County Jail, all persons who are currently 'convicted felons ready for transfer to TDC' ... and to continue thereafter" to do so.

Petitioners seek our writ of mandamus to compel transfer of this *Alberti* third-party complaint to the *"Ruiz"* court, the court in which is pending the case of Ruiz v. Lynaugh, civil action No. H–78–987, United States District Court for the Southern District of Texas, Houston Division. The *Ruiz* case, of course, is the class action by inmates of TDC-operated prisons which successfully challenged the conditions of confinement there as being invalid under the United States Constitution. *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D.Tex.1980), *aff'd in part and vacated in part*, 679 F.2d 1115, *amended in part*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). The *Ruiz* district court has entered extensive remedial decrees, retained jurisdiction until the plaintiff class obtains complete relief, and has exercised continuing oversight of TDC's efforts to comply with the decrees. *Id. See also Ruiz v. Lynaugh*, 811 F.2d 856 (5th Cir.1987).[3]

1. These petitioners are Charles T. Terrell, Deralyn R. Davis, Joseph V. LaMantia, Allan Bruce Polunsky, James Eller, F.L. "Steve" Stephens, Dennis R. Hendrix, Robert Mann, and Jerry Hodge.

2. The *Alberti* case is also sometimes styled *"Lawrence R. Alberti, et al. v. Johnny Klevenhagen, et al."* Klevenhagen is the Sheriff of Harris County, Texas. In addition to Klevenhagen, other defendants in *Alberti* are the county judge and the county commissioners of Harris County, comprising the Harris County Commissioners Court, the governing body of the county, and, apparently, Harris County itself.

Previously reported decisions in *Alberti* are: *Alberti v. Sheriff of Harris County, Texas*, 406 F.Supp. 649 (S.D.Tex.1975); *Alberti v. Heard*, 600 F.Supp. 443 (S.D.Tex.1984), *aff'd sub nom Alberti v. Klevenhagen*, 790 F.2d 1220 (5th Cir. 1986); and *Alberti v. Klevenhagen*, 660 F.Supp. 605 (S.D.Tex.1987).

3. The *Ruiz* case was originally filed in 1972 in the United States District Court for the Eastern District of Texas, but in 1978 it was transferred to the United States District Court for the South-ern District of Texas under 28 U.S.C. § 1404(a). *See* 503 F.Supp. at 1276 & n. 5. A few days thereafter, the Chief Judge of the Southern District of Texas designated Judge William Wayne Justice, Chief Judge of the Eastern District of Texas, to preside over the *Ruiz* case, and Judge Justice has done so since that time (as he also did when the case was in the Eastern District). In February 1979, we issued a writ of prohibition forbidding the moving of the final months of the *Ruiz* trial back to the Eastern District of Texas. *See* 503 F.Supp. at 1276 n. 5 and 679 F.2d at 1128 n. 18.

Other reported decisions in the *Ruiz* case are: *In re Estelle*, 516 F.2d 480 (5th Cir.1975), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976) (denying TDC's requested mandamus to bar the United States' participation in the suit); *Ruiz v. Estelle*, 550 F.2d 238 (5th Cir.1977) (affirming portions of preliminary injunction); *Ruiz v. Estelle*, 609 F.2d 118 (5th Cir.1980) (dismissing TDC's appeal from award of interim attorneys' fees); *Ruiz v. Estelle*, 650 F.2d 555 (5th Cir.1981) (granting in part and denying in part TDC's requested stay of the district court's decree); and *Ruiz v. Estelle*, 666 F.2d 854 (5th

### Context Facts and Proceedings

In the original 1975 consent decree in the *Alberti* case, the district court retained jurisdiction to issue further orders until the Harris County jail facilities and operations were brought into compliance by the defendants there, the Sheriff and members of the Commissioners Court of Harris County. In April 1987, the district court appointed monitors to assess conditions in the facilities and make findings respecting the defendants' compliance with the consent decree and subsequent court orders and, *inter alia*, the maximum capacities of the county's various jail facilities. *Alberti*, 660 F.Supp. at 608. In their report of September 12, 1988, the monitors found several different specific areas of noncompliance, and also concluded that the jail had become dangerously overcrowded, largely because TDC was not accepting sufficient numbers of the convicted felons being held in the jail awaiting transfer to TDC. The monitors noted that from January 1988 to July 31, 1988 the jail population had grown from 4,376 to 5,642 and that of the latter figure some 1,300 were convicted felons awaiting transfer to TDC. In the three months ended July 31, 3,475 prisoners became eligible for transfer to TDC but only 2,303 were transferred, thus increasing the number ready for transfer by 1,172. The monitors considered the jail's design capacity to be 4,315, which was expected to increase to 4,745 by January 1989 when completion of a new 430–person facility was expected. They recommended a population "cap" of 110 percent of design capacity (or 5,220) when this new facility was operational, which would be reduced to 95 percent of design capacity when an additional 4,000–person contemplated facility was ready or in any case by June 1, 1991. The monitors noted that "[i]t makes sense for the defendants to seek to implead TDC into these proceedings, since it is unlikely that the ceiling and reductions recommended here can be met without the active involvement of the State correctional system."

On the basis of this report, the district court *sua sponte* entered an order on November 8, 1988 requiring the Harris County Sheriff to transport and deliver to TDC every week, commencing December 5, 1988, 250 of the male and 40 of the female convicted felon inmates of the Harris County jail who had been ready for transfer to TDC for at least ten days. This order was to continue in effect until all such prisoners had been transferred to TDC. The district court observed that under Texas law, TDC was "responsible for housing persons ... convicted of felony offenses in the State criminal courts," citing Tex. Penal Code Ann. §§ 12.32–12.34 and Tex.Code Crim. Proc.Ann. § 42.09, and was required to provide for the " 'speedy transportation of prisoners from counties where sentenced to the State penitentiary,' " citing Tex.Rev. Civ.Stat.Ann. art. 6166r. The court found that "dangerously overcrowded conditions exist" in the Harris County jail which "have been exacerbated substantially, if not caused primarily or solely, by the failure of TDC to receive convicted felons ready for transfer to TDC in sufficient numbers and in a sufficiently timely manner."

TDC, however, refused to accept all of the prisoners tendered by Harris County pursuant to the *Alberti* court's November 8 order, stating that it would not accept prisoners from Harris County, or any other county, above the number allocated to that county pursuant to TDC's scheduled admissions policy. This policy was formulated in response to certain developments in the *Ruiz* case. The *Ruiz* "decree contains specific provisions that limit [TDC] prison population." 688 F.2d at 267. In 1985, the *Ruiz* parties entered into a "Crowding Stipulation," which the *Ruiz* court approved and adopted, the effect of which was "to limit the state-wide prison population to 95% of TDC's maximum capacity," calculated with reference only to those facilities, new or existing, which complied with certain formulas for maximum inmate populations and other specified standards, and

Cir.1982) (granting in part and denying in part TDC's second requested stay of the district court

decree).

excluding (with narrow exceptions) all temporary housing. 811 F.2d 857, 858. In September 1986, TDC moved to modify certain aspects of the Crowding Stipulation so it could increase the capacity of the prison system without new construction, citing an asserted "unforeseen and extraordinary 12.02% [inmate] increase in 1985–86," but the *Ruiz* court refused the requested relief and we affirmed. 811 F.2d 856, 858. TDC adopted its scheduled admissions policy in September 1987, allegedly in response to administrative difficulties it experienced in the spring and summer of 1987 when, in order to maintain its population under the *Ruiz*-specified 95 percent of capacity limitation, it periodically refused all admissions, with the consequence that when admissions were "open," large groups of prisoners would be transferred from the various counties at one time, resulting, according to TDC, in "a chaotic intake situation" and adverse effects on TDC's ability to comply with certain requirements of the *Ruiz* decree relating to inmate classifications and population limits of individual TDC units. Under TDC's scheduled admissions policy, admissions are allocated among all Texas counties on the basis of their respective records of past admissions to TDC, a formula which apparently gives Harris County a quota of 25.25 percent of all TDC admissions. According to TDC, its scheduled admissions policy greatly reduced the number of days TDC had to be closed to admissions to stay within the *Ruiz* required 95 percent of capacity limitation.

In January 1989, following TDC's refusal to accept Harris County inmates in the numbers and at the rate specified by the *Alberti* court's November 8 order, the *Alberti* defendants, with leave of the *Alberti* court, filed their third-party complaint against our individual petitioners, the Governor, the TDC director, and the members of TDC's governing board, in their official capacities. The third-party complaint recites the *Alberti* court's November 8 order, and alleges that under Texas law TDC has the duty to speedily accept convicted felons

from Texas counties, including Harris County. It also alleges that the Governor has not invoked the Texas Prison Management Act, Tex.Rev.Civ.Stat.Ann. art. 6184*o*, which provides that when the attorney general certifies in writing to the governor that TDC "has reached 95 percent of capacity" then "the governor shall immediately certify that an emergency overcrowding situation exists and shall order the [TDC] director to credit not more than 90 days of administrative good conduct time to all eligible inmates." *Id.* § 2(b).[4] The third-party complaint further asserts that TDC has refused to accept Harris County inmates as required by the *Alberti* court's November 8 order, and that "[g]iven this refusal," the Sheriff and Harris County "lacking statutory authority to simply release TDC ready felons ... cannot achieve compliance with the Court's November 8, 1988, Order and protect Plaintiffs' adjudicated rights without joining Third Party Defendants and securing injunctive relief against them." The third-party complaint requests judgment against the third-party defendants "ordering them to immediately remove from the Harris County Jail, all persons who are currently 'convicted felons ready for transfer to TDC' ... and to continue thereafter" to do so. No other possible relief is specified.

In response to the third-party complaint, the third-party defendants filed numerous motions, including a motion to dismiss which generally asserted their lack of responsibility for or control over the Harris County jail and that their state law duties to receive prisoners were not actionable or enforceable in the federal forum, relying on the Eleventh Amendment, *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Bush v. Viterna*, 795 F.2d 1203 (5th Cir.1986), and the constraints, particularly as to capacity, imposed on TDC by the *Ruiz* decree. The third-party defendants also requested joinder of all Texas counties and all inmates allegedly backlogged in

**4.** The third-party complaint does not allege— nor does it appear to have ever been claimed in *Alberti* or in this mandamus—that the Attorney

General has certified in writing to the Governor that TDC has reached 95 percent capacity.

county jails on grounds that, due to TDC capacity constraints and the *Ruiz* decree, granting relief to Harris County would prejudice other counties and would expose the third-party defendants to multiple or inconsistent obligations. They also requested abstention under *Railroad Commission of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), pointing to a pending state court case concerning TDC's duty to accept felony convicted county prisoners, and under *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), in respect to TDC's scheduled admissions policy.[5]

By its order of May 12, 1989, the *Alberti* court denied all of the third-party defendants' above-referenced motions, ruling that they had "a state-imposed duty to 'speedily' accept convicted felons into TDC" under article 6166r and "a federal constitutional duty to not impose cruel and unusual punishment upon persons convicted of a felony." The court concluded that *Pullman* abstention was inappropriate because the state law duty was not ambiguous or uncertain, and *Burford* abstention was not called for because there was no provision for judicial review of TDC's scheduled admissions policy. The court further determined that the *Ruiz* decree was not implicated, and it was inappropriate to join other Texas counties and the inmates of their jails, because there were "solutions" which would allow TDC to accept more county prisoners and still remain within the *Ruiz* imposed 95 percent of capacity limitation. The court explained this in footnote nine of its order, stating there that "Third–Party Defendants could have begun their now-ambitious prison building campaign earlier and with more vigor, they could immediately enter into contracts with other suitable facilities to provide space for the felons, or, ... they could make significant use of the Texas Prison Management Act."

On June 2, the monitors filed their "final findings" which addressed a number of different specific conditions and practices in the Harris County jail facilities, but primarily stressed overcrowding. The monitors noted that as of April 30, 1989, the number of inmates was 7,364, of whom 2,824 were convicted felons awaiting transfer to TDC, and opined that the overcrowding was such as to be unconstitutional and to "have reached a point where swift and dramatic action is required forthwith." They stated, "[I]t is time now to put a cap on the population of the Jail ... and begin to move swiftly to reduce the number of prisoners incarcerated.... The numbers cannot be allowed to escalate further."[6]

In response to this report, the *Alberti* court on June 9 issued an order stating that "the Court, *sua sponte,* moves for summary judgment in favor of Defendants and against Third–Party Defendants for the relief sought in the Defendants' third-party complaint." The order stated that the monitors' June 2 final findings would be accepted as factually correct for pur-

---

5. They further requested a stay pending application to the Judicial Panel on Multidistrict Litigation for consolidation with related litigation pursuant to 28 U.S.C. § 1407. This motion was denied as the third-party defendants apparently filed no application with the Judicial Panel on Multidistrict Litigation. The third-party defendants also unsuccessfully moved to dismiss for want of venue, or to transfer to the Western District of Texas, Austin Division, under 28 U.S.C. § 1391(b).

6. At this time, the new facility with a design capacity of 430 which had been expected to open in January had apparently not yet done so, but the monitors noted that it was "due on line within the next 60 days."

   In their March 31 report, the monitors had also stressed overcrowding and the large number of TDC-ready prisoners (over 2,500 out of a March 1 inmate population of about 7,000). They noted that "[t]he defendants have so far been able to cope with the problems generated by intensely overcrowded conditions ... without a major disturbance or other similar disaster," but that "the continuing ability of the system and its caretakers to maintain control of the situation is becoming increasingly attenuated." They also observed that "the facilities and their inhabitants are generally clean and sanitary," but that overcrowding would cause a security "breakdown without a massive infusion of additional staff." The March 31 report concluded that "defendants must develop *now* some way either to curb the number of TDC felons in Harris County facilities or divert elements of their non-TDC population." (Emphasis in original.)

poses of the summary judgment, unless by July 24 specific sworn objections were made; matters not so objected to would be deemed admitted. If no such objections were made, the summary judgment would be deemed submitted on August 14; if objections were made, the court "will proceed by holding a plenary evidentiary trial to the bench on August 14." [7]

Meanwhile, on May 30, plaintiffs had moved the *Alberti* court to transfer "to the judge presiding over" the *Ruiz* case (a) three pending motions the plaintiffs had earlier filed—which sought imposition of a population limit on the Harris County jail, and, apparently, permitting nonviolent felony offenders sentenced to five years or less in TDC to remain on bail in the discretion of the sentencing court until TDC is ready to accept them, and requiring additional guards at the Harris County jail—*and* (b) the defendants' "motion" for an order directing the third-party defendants to remove the TDC-ready felons from the Harris County jail.[8] Plaintiffs sought the requested transfer under 28 U.S.C. § 137 or alternatively under Fed.R.Civ.P. 42(a). They asserted that these motions "implicate the *Ruiz* litigation to some extent," that the appropriate relief to be granted in *Alberti* "depends, to some extent, on the relationship between the relief sought and the exigencies of the *Ruiz* case and conditions within the Texas Department of Corrections," and that "the *Ruiz* judge's

understanding of the constraints of the *Ruiz* orders would be undeniably helpful in fashioning effective relief on the population issues in the *Alberti* litigation and would avoid the possibility of inconsistent decrees." Plaintiffs also noted that the "jurisprudential rationale" of *Gillespie v. Crawford*, 858 F.2d 1101 (5th Cir.1988), "would suggest that the *Ruiz* judge pass upon" the matter sought to be transferred.[9] In a written response to this motion of plaintiffs to transfer, the third-party defendants specifically opposed transfer of each of the three pending motions of plaintiffs, but "join[ed] in plaintiffs' request that the third-party complaint be transferred to the judge presiding over *Ruiz*."[10]

Thereafter, on June 26, the third-party defendants filed a motion requesting that the *Alberti* court reconsider its May 12 order. This motion was based on a recently enacted statute passed by the Texas Legislature and signed by the Governor on June 15, 1989. This extensive statute— H.B. 2335, effective September 1, 1989— among other things creates the Texas Board of Criminal Justice ("TBCJ") as the governing body of the new Texas Department of Criminal Justice ("TDCJ"), which among other things takes over the functions of TDC.[11] The third-party defendants pointed to section 3.04 of H.B. 2335 which deleted the words "and speedy" from the portion of article 6166r which had required

---

7. Defendants and third-party defendants were ordered to file a joint pretrial order by August 7.

The June 9 order also recites that "the proceedings involving Defendants and Third–Party Defendants are presently *pre*-judgment. Third–Party Defendants did not join in the original 1975 consent judgment entered in this case, nor can they be bound by the detailed subsequent remedial orders entered in 1975 and 1984." (Emphasis added.)

8. This referred to a "response" which defendants had filed on May 16 to "tentative findings" which had earlier been submitted by the monitors. In their May 16 "response," defendants asserted that "[a]n immediate hearing" was needed on the injunction requested in their third-party complaint, and they "urge[d]" the court to order the third-party defendants "to remove their TDC-ready felons from Harris County Jail facilities."

9. The district court's June 9 order did not address plaintiffs' motion to transfer.

10. The third-party defendants in their response also called attention to various other suits pending in other Texas state and federal courts concerning alleged overcrowding in the jails of other counties, in which suits it was sought to require TDC to accept the TDC-ready county inmates.

11. Section 1.02(a) of H.B. 2335 states, respecting the TDCJ, that:

"(a) The department is the state agency with primary responsibility for:

"(1) the confinement, supervision, and rehabilitation of felons;

"(2) the development of a system of state and local punishment, supervision, and rehabilitation programs and facilities; and

"(3) the reintegration of felons into society after release from confinement."

the relevant state agency (formerly TDC, now TDCJ) to provide "for the safe and speedy transportation of prisoners from counties where sentenced to the State penitentiary." They also called attention to the provision of H.B. 2335 requiring the TBCJ to adopt and enforce a formula to allocate among Texas counties the number of prisoners to be transferred to the state penitentiaries when those facilities lacked sufficient capacity to take all such prisoners.[12] The third-party defendants contended that under H.B. 2335 their state law duty "is only to accept inmates TDC has capacity for." They further contended that H.B. 2335 made abstention especially appropriate. Alternatively, the third-party defendants requested that the court, if it would not reconsider its May 12 order, stay the case pending consolidation in one case of all actions seeking that TDC accept county inmates (but *excluding* all claims "for relief, such as caps, directed at local jails"). In this connection, the third-party defendants stated that "the judge presiding over the *Ruiz* case would be in the best position to resolve all issues concerning TDC's alleged duty to accept inmates and avoid conflicting orders."

In his *Alberti* order of July 10, 1989, Chief Judge DeAnda denied the motion to reconsider and the requests for transfer made by plaintiffs and third-party defendants. He concluded that notwithstanding H.B. 2335, TDC and TDCJ were responsible under state law to confine convicted felons, and in any event, "[t]he fact that Third-Party Defendants may no longer have a state-law duty to 'speedily' accept convicted felons contrary to their admissions allocation formula does *not* abate their federal Constitutional duties toward these felons." (Emphasis in original.) Judge DeAnda also rejected the contentions of "Plaintiffs and Third-Party Defendants ... that certain matters should be reassigned to the Presiding Judge in *Ruiz*" and determined "it would be improper to stay, consolidate, or reassign any of the matters pending in this case." [13] The court noted that the *Gillespie* case was inapposite because it was undisputed that the plaintiffs, Harris Coun-

---

12. Section 3.06 of H.B. 2335 adds a new article 6166a–4 which provides in relevant part:

"Art. 6166a–4. ALLOCATION FORMULA. (a) The Texas Board of Criminal Justice shall develop, adopt, and enforce an allocation formula that fairly and equitably allocates to each county or group of counties served by a community corrections and supervision department the number of institutional division admissions allocated to the county or counties until sufficient capacity is available in the institutional division. In devising the formula, the board shall consider relevant factors for each county or group of counties served by a department and shall assign weights to those factors as determined appropriate by the board. The factors shall include but are not limited to:

"(1) the percentage of prison admissions for the entire state that were used by the county or counties in the preceding 12 months;

"(2) the percentage of the state's violent index crime that occurred in the county or counties in the preceding 12 months;

"(3) the percentage of the state's total index crime that occurred in the county or counties in the preceding 12 months;

"(4) the percentage of the state's total arrests under the Texas Controlled Substances Act (Article 4476–15, Vernon's Texas Civil Statutes) that occurred in the county or counties in the preceding 12 months;

"(5) the percentage of the state's population residing in the county or counties; and

"(6) the percentage of the state's total unemployment in the county or counties.

"(b) If the board is unable to obtain for a factor listed in Subsection (a) of this article information for the preceding 12–month period, the board shall consider the most recent information available for that factor.

"(c) The board must consider waiving the allocation formula under this article and may waive the formula for a county:

"(1) that experiences a rapid increase in persons convicted of felonies for reasons other than traditional sentencing practices in the county; or

"(2) in which the jail inmate population exceeds the approved capacity of the county's jail facility, as established by the Commission on Jail Standards.

"(d) The board shall adopt the first formula required by this section not later than February 1, 1990, and shall revise the formula on an annual basis.

"(e) The board may not waive the allocation formula under Subsection (c)(2) of this article on or after November 30, 1990."

13. The court noted that the third-party defendants opposed "the reassignment of any motion requesting relief 'such as caps, directed at local jails.'"

ty inmates, were *not* members of the *Ruiz* class, and that "the Court does not need to be familiar with conditions of confinement in TDC. The relevant inquiry here concerns the conditions of confinement in the Harris County Jail, a matter with which the *Ruiz* Court is certainly not familiar." The court concluded that, for the reasons stated "[i]n footnote nine of the Court's May 12, 1989 Memorandum and Order," it was clear that "TDC *could* accept additional convicted felons *without* exceeding its [*Ruiz* imposed] population limits." (Emphasis in original.) The court rejected the third-party defendants' assertions that "any order this Court would enter regarding Defendants' third-party complaint would conflict with the remedial decree in *Ruiz*" because, as explained in its May 12 order, "it believes an actual conflict will not arise." [14]

This order led to the filing of the instant mandamus to require the transfer of the *Alberti* third-party complaint to the judge presiding over the *Ruiz* case. The mandamus petitioners have sought expedited consideration of their application and alternatively a stay of the *Alberti* proceedings set for trial August 14. The *Alberti* plaintiffs have opposed any stay of proceedings in *Alberti*. The *Alberti* plaintiffs do *not* oppose issuance of our mandamus to require transfer to the *Ruiz* court of the third-party complaint, *but* they assert that *if* such relief is granted we should also direct transfer to the *Ruiz* court of their pending *Alberti* motions to impose an inmate population limit on the Harris County jail, to prohibit the *Alberti* defendants from retaining custody of TDC-ready inmates until the Harris County jail population is sufficiently reduced to constitutionally house them, to permit nonviolent offenders sentenced to five years or less in TDC to remain on bail, in the sentencing court's

discretion, until TDC is ready to receive and accept them, and to provide additional guards at the Harris County jail. The *Alberti* plaintiffs assert that "a significant component of [Harris County] jail overcrowding (but by no means the entire culprit) is the failure of the Texas Department of Corrections to accept TDC-sentenced inmates from Harris County in sufficient numbers to keep pace with the number of persons being sentenced to TDC." The *Alberti* defendants—the Harris County Sheriff and Commissioners Court—oppose both the mandamus and the stay sought by petitioners.[15] Amicus representing the sheriff and county commissioners of Travis County, Texas, where an allegedly similar federal suit is pending involving the local jail and TDC's duty to accept convicted inmates, oppose granting the requested mandamus. Counsel for the *Ruiz* class plaintiffs have filed a memorandum opposing the requested relief, stating that because of the Texas Prison Management Act, TDC could both comply with the *Ruiz* decree and any order of the *Alberti* court requiring TDC to accept prisoners from the Harris County jail.

### Discussion

That in circumstances of this general kind we have jurisdiction to issue a writ of mandamus as here sought, and that there are no inflexible jurisprudential barriers precluding all such relief, necessarily follows from our decision in *Hamilton v. Morial*, 644 F.2d 351 (5th Cir.1981). Whether, and if so to what extent, we should grant such relief in the particular circumstances of this case is, however, another matter.

---

**14.** The court further noted this Court's statement in *Ruiz* that state officials "may elect to balance prison population and physical facilities by parole, furloughs, pardons, confinement in county institutions, use of minimum security institutions for some inmates, changes in sentencing policies, or in other ways." 679 F.2d at 1148.

The July 10 order also provides that the court "will allow Plaintiffs and Defendants to present evidence relevant to the disposition of Plaintiffs'

pending motions for relief at the August 14, 1989 trial of Defendants' third party complaint."

**15.** In the court below, the defendants apparently filed no opposition to the requests for transfer. However, plaintiffs' motion to transfer below recites that plaintiffs' counsel, after consultation with counsel for defendants and third-party defendants, was unable to "agree about the resolution of this matter."

■ We conclude that mandamus should issue requiring the transfer, to the judge presiding over the *Ruiz* case, of so much of the *remedy* portion of the *Alberti* third-party action against our individual petitioners (in their official capacities) as seeks to enjoin them to receive or take prisoners into TDC confinement (or to otherwise take action in the operation or management of TDC-operated confinement facilities).

In the present context, we consider this result as properly implementive of the goals which animated our decision in *Gillespie*. We recognize that *Gillespie* dealt with individuals who were members of the *Ruiz* class, while the *Alberti* plaintiffs are not, and that it is not clear that any order in *Alberti* will actually conflict with the *Ruiz* decree or directly speak to matters expressly covered thereby. However, *Gillespie* was based on this Court's exercise of its supervisory power and its concepts of proper judicial administration, rather than on hard-and-fast theories of class action preclusion. Moreover, *Gillespie* was not limited to instances where the equitable relief sought addressed a subject matter encompassed by the *Ruiz* decree. We stated in *Gillespie*:

> "Permitting multiple courts to entertain equitable claims and issue decrees *that might affect the Texas prison system* would require other courts to become familiar with the *Ruiz* decree, the current problems of the Texas prison system, and the possible disruptive effect of the exercise of equitable powers over matters covered by the *Ruiz* decree. Moreover, if separate suits for equitable relief are filed in other districts than that in which *Ruiz* is pending, *even with respect to problems not encompassed by the relief granted in Ruiz*, the court's orders may hobble the effect of the *Ruiz* court's continuing decree over the Texas prison system and its power both to en-

force and to modify that decree." 858 F.2d at 1103 (emphasis added).

Here, it is clear that granting the relief sought in *Alberti* against petitioners "might affect the Texas prison system." We do not suggest that minor or indirect effects are within *Gillespie*'s rationale. But here we are dealing with the county having the largest population in Texas, apparently accounting for 25 percent of TDC's "intake." Ordering that thousands of county inmates be promptly taken into TDC prisons is certainly something which would have a direct and substantial effect on "the Texas prison system." [16] The fact that action under the Texas Prison Management Act might, *in time*, lessen or eliminate any resultant increase in TDC population or any direct conflict with the *Ruiz* decree does not necessarily mean that such a mandatory intake order would have no direct and substantial effect on the TDC-operated Texas prison system, particularly as similar orders might be entered in other cases involving large, metropolitan counties.[17]

■ We decline, however, to order transfer to the *Ruiz* court of any other portion of the *Alberti* litigation. In particular, we decline to order such a transfer of (1) the *Alberti* plaintiffs' several motions in that case for orders establishing a limit or "cap" on the number of inmates confined in the Harris County jail facilities (either as a whole or as to individual units), prohibiting the Harris County Sheriff from retaining custody of TDC-ready inmates, permitting nonviolent offenders sentenced to five years or less in TDC to remain on bail, in the discretion of the sentencing court, until TDC is ready to accept them, and requiring additional guards at the Harris County jail, and (2) the merits or liability phase of the *Alberti* third-party complaint.

Conditions in the Harris County jail are matters within the special knowledge and competence of the *Alberti* court, but not

---

**16.** We observe that the *Alberti* plaintiffs, in a July 28 filing in this Court, have advised us that there now are "more than 3,600" TDC-ready convicted felons confined in the Harris County jail facilities awaiting transfer to TDC.

**17.** This is likewise true as to the fact—if it be such—that TDC would now have more space *if* it had begun its building program earlier and pursued it with more vigor, and as to TDC's supposed ability to enter into contracts for more TDC-operated prison space.

the *Ruiz* court. This is especially true given the great length of time—some seventeen years—each of these actions has been separately pending before different judges. Under Texas law, county jails are under local control, management, and operation, *see Bush* and Texas Local Government Code §§ 351.001, 351.041, while the Texas prison system is under the operation and control of TDC. The experience to date in Texas has not demonstrated the need for the kind of centralization that would result from the more expanded sort of transfer which we decline to order. *Cf. Stewart v. Winter,* 669 F.2d 328, 337–38 (5th Cir. 1982). We consider *Hamilton* to have been presented in a sufficiently different context so as not to require here relief of anywhere near the *Hamilton* extent of centralization. *Hamilton* was decided somewhat earlier in the history of Louisiana prison litigation, within seven or eight years after the initiation of the major Louisiana prison litigation and within six years after the major district court decree therein. Here, as indicated, *Ruiz* and *Alberti* have been pending for some seventeen years and the *Ruiz* merits decree was issued nearly nine years ago. And, in *Hamilton,* unlike the present case, the largest federal district court concerned had specifically requested the transfer. Moreover, there are significant differences between Louisiana and Texas in terms of the numbers of persons and geographic size of the areas involved. Finally, we note that there appears to be reason to believe that significant "backing up" of TDC-bound prisoners in county jails may not long continue. In their reply to plaintiffs' response to the petition for mandamus, petitioners inform us that

> "by April of next year TDC anticipates obtaining a net gain of close to 10,000

state prison beds through new construction. Moreover, in a massive criminal justice reform package the 71st Legislature has just approved an additional 11,000 beds, 4,500 of which are already funded, with the remainder subject to a voter referendum in the fall. An additional 4,500 reserve beds have also been authorized. The state has also authorized 5,800 beds to be utilized to divert offenders from the state prison system through a continuum of sanctions in the community." (Footnote omitted.)[18]

Certainly at this stage we regard consideration of any large-scale centralization in the *Hamilton* mode to be premature.

Our only purpose is to avoid having a non-*Ruiz* court entertain the issuance of a decree that might directly and substantially affect happenings within the Texas prison system. We thus limit our direction for transfer to the *Ruiz* court to so much of the *relief* portion of the third-party complaint as seeks an injunction ordering our individual petitioners (in their official capacities) to receive or take prisoners into TDC confinement or to otherwise take action in the operation or management of TDC-operated confinement facilities.[19] We do not direct transfer of the merits-liability aspect of the third-party complaint. It is evident that in order to decide the merits of the third-party complaint, the district court will have to first decide[20] whether the Harris County inmates' rights under the United States Constitution are being violated and then whether, and if so to what extent and in what respect, the third-party defendants are legally responsible for such violations under 42 U.S.C. § 1983. In making this latter determination, the district court, though it does not enforce state-created

---

**18.** Petitioners also advise that "the state legislature equalized goodtime awards for inmates in county jails with those of inmates at TDC. This allows inmates in county jails awaiting transfer to TDC the same number of goodtime days as inmates arriving in the state prison system. This will also increase the pool of inmates who can be released directly to parole from county jails (parole in absentia) or who can be transferred directly from county jails to pre-parole facilities thereby bypassing TDC."

**19.** However, the only relief specifically requested in the third-party complaint is an order directing our individual petitioners (the third-party defendants) to take the TDC-ready felons who are inmates of the Harris County jail facilities. What other conceivable relief under the third-party complaint would not require transfer to the *Ruiz* court is thus not before us.

**20.** In a proceeding in which third-party defendants are parties, as the district court recognized in its June 9 order.

rights, must nevertheless look to and at least to a large extent be guided by state law. *See Bush,* 795 F.2d at 1209 ("The states have virtually complete freedom to decide who will be responsible for such tasks" as "operating prisons."). Making these merits-liability determinations requires familiarity with the Harris County jail conditions and the causes thereof, as well as the legal status of TDC and its relationship to Harris County-confined prisoners, but not the conditions in TDC-operated prisons, the constraints of the *Ruiz* decree or the possible disruptive or hobbling effect on that decree, or the *Ruiz* court's enforcement or modification thereof, of orders requiring TDC to accept Harris County prisoners. Thus, we do not direct transfer of the merits-liability phase of the third-party complaint.[21]

For the same reasons, we deny petitioners' request for stay of the scheduled August 14 proceedings in *Alberti.* Not only will these presumably form the basis of the *Alberti* court's merits-liability determinations in the third-party action, but even to the extent that matters relevant to remedy are addressed, there is no reason to postpone the hearing. As to the latter matters, there is no reason that the *Ruiz* judge, when considering the remedial phase of the third-party complaint,[22] may not consider the record of the August 14 hearing, together with such other evidence as may be particularly relevant to conditions within TDC-operated facilities and related matters. Moreover, until the liability-merits issues in the third-party complaint are determined, there is no occasion to transfer any portion of the third-party complaint.

### Conclusion

The petition for mandamus is GRANTED in part and DENIED in part as hereinabove indicated.

---

**21.** The bifurcation of liability and remedy is unusual but not unheard of. Analogously, in *Gillespie,* we mandated the splitting of legal and equitable claims, though they would often relate to the very same operative facts and in such instances would necessarily be predicated on the same liability determination.

**22.** Or, more precisely, so much thereof as seeks an injunction requiring petitioners to accept

Petitioners' motion for stay of proceedings is DENIED.[23]

Harris County inmates into TDC confinement or to otherwise take action in operation or management of TDC-operated confinement facilities.

**23.** As we are confident that the district court will comply with our holding herein when appropriate, we direct that the writ of mandamus not actually issue at this time.