Lawrence R. ALBERTI, et al., Plaintiffs–Appellees,

v.

The SHERIFF OF HARRIS COUNTY, TEXAS et al., Defendants–Third Party Plaintiffs–Appellants, Appellees,

In re Ann RICHARDS, the Governor of Texas, et al., Third Party Defendants–Appellants.

Nos. 90–2441, 90–6034, 91–2210, 91–2274 and 91–2801.

United States Court of Appeals, Fifth Circuit.

July 25, 1991.

Mike Driscoll, County Atty., Lisa S. Rice and Harold M. Streicher, Asst. County Attys., Houston, Tex., Robert Ozer and John B. Worley, Asst. Attys. Gen., Austin, Tex., for appellants in No. 90–2441.

Gerald M. Birnberg, James T. Oitzinger, Houston, Tex., for appellees in No. 90–2441.

Robert Ozer and John B. Worley, Asst. Attys. Gen., Austin, Tex., for appellants in No. 90–6034.

James T. Oitzinger, Gerald M. Birnberg, Mike Driscoll, County Atty., Harold M. Streicher and Lisa S. Rice, Asst. County Attys., Houston, Tex., for appellees in No. 90–6034.

Dan Morales, Atty. Gen., Robert Ozer and John B. Worley, Asst. Attys. Gen., Austin, Tex., for appellants in No. 91–2274.

Harold M. Streicher, El Franco Lee, Jim Fonteno, Steve Radack, Jerry Eversole and Lisa S. Rice, Asst. County Attys., James Oitzinger, Gerald M. Birnberg, Williams, Birnberg & Anderson, Houston, Tex., for appellees in No. 91–2274.

Robert M. Ozer and John B. Worley, Asst. Attys. Gen., Dan Morales, Atty. Gen., Austin, Tex., for appellants in No. 91–2274.

Harold M. Streicher, El Franco Lee, Jim Fonteno, Steve Radack, Jerry Eversole and Lisa S. Rice, Asst. County Attys., James Oitzinger, Gerald M. Birnberg, Williams, Birnberg & Anderson, Houston, Tex., for appellees in No. 91–2274.

Before REAVLEY, HIGGINBOTHAM, and DUHÉ, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is another chapter in the now epic struggle of Texas with its bulging prisons. The reality is that the colloquial expression "state pen" has often been apt. Harris County, Texas, after many years of federal prodding, brought its jails into substantial compliance with constitutional standards. County jails in Texas house both county and state prisoners. A substantial portion of a county's jail population consists of prisoners destined for the state prison system. The struggle of Harris County for an adequate jail system was frustrated by the state's refusal to take its state prisoners. This delay served state penalogical goals, but its resulting success at the state level came out of the hide of Harris County. Judge DeAnda of Houston and Judge Justice of Tyler have commendably presided over this intricate fracas, and we find today no errors in their effort. We are compelled to remand findings of county and state liability due to an intervening decision of the United States Supreme Court. We do so despite compelling evidence of state liability, and some evidence of county liability, only because the requisite fact-findings required by the new law were understandably not made and we decline to exceed our appellate role by supplying the findings.

I.

A. *Procedural background.*

It will soon be twenty years since Lawrence Alberti and his fellow prisoners filed a class action on behalf of past, present, and future inmates of Harris County jails. The complaint named members of the Harris County Commissioners Court and the Harris County Sheriff's Department as de-

fendants and, pursuant to 42 U.S.C. § 1983, alleged that the jails' conditions violated numerous constitutional and statutory provisions.

The original district judge, Judge Bue, conducted extensive hearings, including visits to the facilities. He concluded that conditions in the jails were "inhumane." The plaintiffs and the county then entered into a consent decree on February 4, 1975. The decree called for renovations of existing facilities, the development of a new central jail, and improvements in staff and security. The district court retained jurisdiction to issue further interim orders, and shortly thereafter, on December 16, 1975, the court issued a lengthy opinion setting forth broad guidelines for the streamlining of the criminal justice system, the implementation of an effective pre-trial release program, and the improvement of living conditions within the jails.

At the time of the decree, the county's facilities consisted of a central jail, with a design capacity of 1150, at 301 San Jacinto and a detention center, with a design capacity of 810, in Humble, Texas. In 1982, spurred by the consent decree and later remedial orders, the county completed a new central jail, with a design capacity of 3505, at 1301 Franklin and closed the old central jail. Attendant staffing and supervision concerns were the subject of several additional orders by the *Alberti* court. *See Alberti v. Klevenhagen*, 606 F.Supp. 478 (S.D.Tex.1985); *Alberti v. Heard*, 600 F.Supp. 443 (S.D.Tex.1984). The county also commissioned an expert, Dr. Charles Friel, to consider future needs. Pursuant to his projections, the county authorized the construction of a third jail facility, with a capacity of 4000, at 701 North San Jacinto and the renovation of the old central jail, to house 400, at 301 San Jacinto.

The county filed a motion for final judgment and permanent injunction on February 20, 1987. Shortly thereafter, on April 28, 1987, the *Alberti* court appointed three monitors—a special master, a medical monitor-assessor, and a jail monitor-assessor—to periodically inspect the jails and to assess their conditions, to make findings on the county's compliance with its orders, and to determine the maximum capacities of the jails. *See Alberti v. Klevenhagen*, 660 F.Supp. 605 (S.D.Tex.1987). The monitors issued their first report on October 7, 1987. Of the eighteen conditions surveyed, the monitors found full compliance as to nine, partial compliance as to seven, and non-compliance only as to two, medical and dental care and drug and alcohol treatment. The monitors also found that, as of June 1, 1987, the county's jails were only five percent over their design capacity. However, in light of the inordinate delay in achieving substantial compliance, the monitors recommended continued supervision by the *Alberti* court.

B.  *The state's scheduled admissions policy.*

The state of Texas has been beset with its own overcrowding problems. In 1985, after many years of litigation in *Ruiz v. Estelle*, the state entered into a "crowding stipulation," agreeing to limit the population in its prisons to 95% of capacity. *See Ruiz v. Lynaugh*, 811 F.2d 856 (5th Cir. 1987). To stay within the limits, the state periodically closed its prisons to convicted felons sentenced to the state's prison system, and ready for transfer, but awaiting transfer in county jails. In September of 1987, the state attempted to order the rationing with a "scheduled admissions policy," setting daily quotas on the number of ready-felons that it would accept into its prison system from each county.

As stated by the monitors, "[t]he painful consequences for Harris County of this new admissions policy quickly became evident." A backlog of ready-felons developed, and on December 17, 1987, the *Alberti* court directed the monitors to reassess the jails' conditions in light of the state's new policy. The monitors issued their report on March 21, 1988. They found that the jails were "clean, well-run, and reasonably safe and secure," but warned of the potential consequences of the state's scheduled admissions policy:

What this quota policy means for the defendants is obvious. Over the preced-

ing years, the number of convicted felons in Harris County facilities awaiting transfer to the TDC fluctuated regularly between 100 and 200. By the end of September, 1988 [sic], that number was up to 512; by December 31, 1987, the number stood at 798. Even more alarming than the growth itself is the likelihood that it will continue at about the same rate for the foreseeable future.... Harris County is, in effect, operating an 800–bed facility for TDC; by March or April, they may be operating the equivalent of a 1,000 bed facility.

By September of 1988, the monitors' dire forecast was realized. In their fourth report, issued on September 12, 1988, the monitors found that the jails' population increased from 4576 in January of 1988 to 5650 in July of 1988, or thirty percent over design capacity. The monitors concluded that the jails were dangerously overcrowded:

> All systems are impossibly stressed, including food service, programming, elevators, recreation, classification, maintenance, visiting, supplies of clothing and bedding, security, medical care, and mental health services. So far these stressed systems have not broken down completely under the population pressures, but the Monitors believe that there is no elasticity left in the institution and its service systems.

The monitors further concluded that the appropriate capacities of the central jail at 1301 Franklin and the detention center in Humble were 3330 and 770 respectively, or 95% of design capacity. They recommended that the *Alberti* court direct the county and state to immediately reduce the jails' population to 120% of design capacity (4200 at the central jail and 970 in the detention center) and also set future population caps at 110% of design capacity upon the completion of the renovation of the old central jail at 301 San Jacinto and 95% of design capacity upon the completion of the new facility at 701 San Jacinto.

On November 8, 1988, on the basis of the monitors' report, the *Alberti* court *sua sponte* directed the county sheriff to transport and deliver to the Texas Department of Corrections (later the Texas Department of Criminal Justice—Institutional Division) at least 290 ready-felons each week beginning December 5, 1988. The court reasoned that, under Texas law, "the TDC, not Sheriff Klevenhagen or the Harris County Commissioner's Court, is responsible for housing persons who have been convicted of felony offenses in the State criminal courts." In support of this conclusion, the court cited Tex.Penal Code §§ 12.32–12.34, Tex.Code Crim.Proc. Art. 42.09 § 2, and Tex.Rev.Civ.Stat. Art. 6166r (now Tex.Gov. Code § 499.006). The state, however, refused to accept ready-felons above the quota allocated to the county in its scheduled admissions policy, leaving the county unable to comply with the order.

By December of 1988, the population of ready-felons in the county's jails leaped to over 2100, representing more than a third of the jails' population. On December 12, 1988, the county moved the *Alberti* court to require the plaintiffs to join state officials as additional defendants, urging that it could not achieve constitutional compliance without the participation of the state. The *Alberti* court denied the motion on January 12, 1989, but allowed the county to file a *third-party complaint* against the state. In the third-party complaint, the county prayed that the court enjoin the state to immediately remove all ready-felons from its jails; the county sought no monetary damages.

The state moved to dismiss the county's third-party complaint and, alternatively, for the joinder of all Texas counties and all ready-felons backlogged in Texas county jails. The state also moved to dismiss for lack of venue, to transfer venue, and to stay the *Alberti* proceedings pending an application to the judicial panel on multidistrict litigation. On May 12, 1989, the *Alberti* court denied the motion, reasoning that the state had a state law duty to "speedily" accept ready-felons and a federal constitutional duty not to impose cruel and unusual punishment on felons. *See* Tex.Rev.Civ.Stat. Art. 6166r (now Tex.Gov. Code § 499.006). If the state violated the latter constitutional duty, continued the

court, then *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), would not bar an order compelling compliance with constitutional standards. The court also denied the venue arguments, concluded that *Ruiz* was no bar to the third-party complaint, refused to abstain, and found the joinder of all other Texas counties unnecessary.

### C. *The In re Clements bifurcation.*

On May 30, 1989, the plaintiffs moved the *Alberti* court to transfer to the *Ruiz* court their pending motions for a population cap on the county's jails and the county's motion for an order directing the state to remove ready-felons from its jails. The state joined the request that the third-party complaint be transferred to the *Ruiz* court.

Meanwhile, on June 26, 1989, the state moved the *Alberti* court to reconsider its May 12 order in light of a recently enacted statute, H.B. 2335, Tex.Gen. & Special Law 1989, Reg.Sess., Ch. 785, effective September 1, 1989. H.B. 2335 made a number of changes in the state's criminal justice system. Most relevant to this appeal, H.B. 2335 created the Texas Board of Criminal Justice as a replacement for the Texas Department of Criminal Justice, deleted the word "speedy" from Tex.Gov.Code § 499.006, and authorized the adoption of the scheduled admissions policy. Alternatively, the state moved the *Alberti* court to transfer the third-party complaint to the *Ruiz* court; the state objected, however, to the transfer of the plaintiffs' pending motions.

The *Alberti* court denied both the requests for transfer and the motion to reconsider on July 10, 1989. The court reasoned that the transfer was not required by this court's *en banc* decision in *Gillespie v. Crawford,* 858 F.2d 1101 (5th Cir. 1988), nor would it advance the purposes of *Gillespie.* As to the adoption of H.B. 2335, the court stated:

> [t]he fact that Third–Party Defendants may no longer have a state-law duty to 'speedily' accept convicted felons contrary to their admissions allocation for-

mula does *not* abate their federal Constitutional duties toward these felons.... Third–Party Defendants' federal Constitutional duty to not impose cruel and unusual punishment upon convicted felons remains, regardless of the actual location of the felons' confinement.

The plaintiffs and the state then petitioned for a writ of mandamus from this court. We granted the writ in part on August 11, 1989, transferring to the *Ruiz* court

> so much of the *relief* portion of the third-party complaint as seeks an injunction ordering our individual petitioners (in their official capacities) to receive or take prisoners into TDC confinement or to otherwise take action in the operation or management of TDC-operated confinement facilities.

*In re Clements,* 881 F.2d 145 (5th Cir. 1989).

### D. *The bench trial.*

The population of ready-felons in the county's jails continued to escalate, and by March of 1989, the jails' total population exceeded 7200, forcing 2700 prisoners to sleep on the floors each night. As stated by the monitors, "[t]o put this into some perspective, Harris County now has more prisoners sleeping on the floors of its detention facilities than the total number of convicted offenders incarcerated in each of fourteen states." In light of the increase in total population, the monitors revised their recommendations in a report issued on April 11, 1989. They suggested that the *Alberti* court direct the county and state to reduce the jails' population to 7000 (6000 in the central jail and 1000 in the detention center) within 30 days, 6400 (5500 in the central jail and 900 in the detention center) within 90 days, 5800 (4990 in the central jail and 810 in the detention center) within 180 days, and 5200 (4390 in the central jail and 810 in the detention center) within 270 days. They further suggested that the *Alberti* court set a final population cap of 8732, equal to design capacity, upon completion of the new facility at 701 San Jacinto. In a report issued the following month, on June 1, 1989, the monitors concluded

that "living conditions for inmates ... have become intolerable, shocking to the conscience and unequivocally unconstitutional."

The *Alberti* court held a "merits-liability" bench trial August 14 through 18, 1989. By the time of the trial, the total population in the county's jails stood at 8086, or 188% of design capacity, with ready-felons, then a population of 3420, representing 45% of the total population. A parade of witnesses testified to the ill effects of the overcrowding. The lead special master, J. Michael Keating, described "much attenuated protection" because of inadequate staff, inadequate ventilation and food service, supply shortages, precarious fire safety, and a medical care system on the verge of collapse. The captain of the central jail, Don McWilliams, concurred with Keating's assessment and, in addition, testified to "a spectacular increase in the incidence of disciplinary infraction."

The *Alberti* court held an additional hearing on the plaintiffs' requests for supplemental relief September 12 through 15, 1989. At the hearing, the court expressed its concern that the county's joinder of the state as a third-party defendant could suffer jurisdictional defects under *Pennhurst.* Upon the court's suggestion, the plaintiffs sought leave to file a supplemental complaint against the state on September 15, 1989.

The *Alberti* court issued its findings of fact and conclusions of law on September 25, 1989. The court opened its opinion by granting the plaintiffs' motion for leave to file the supplemental complaint. It found that the conditions in the jails were "cruel and unusual," citing extreme overcrowding as "the primary cause" of the constitutional violation. More specifically, the court found that 2800–2900 prisoners slept on the floor each night, forming a "human carpet" in some cellblocks, that the staff was inade-

quate to assure the safety of all prisoners, that there had been a great increase in disciplinary violations, that there were problems with plumbing and ventilation, that fire safety was "severely compromised," that supplies and food service were inadequate, that medical care conditions reflected "conscious indifference towards the inmates' serious medical needs," and that county judges gave greater weight to pretrial release recommendations than state judges.

The *Alberti* court concluded that the county was liable for the violation because, under Texas law, its sheriff and commissioners court were keepers of the jails. Tex.Local Govt.Code §§ 351.001–351.015 and 351.041–351.042. The court further found the state jointly liable because, under Texas law, it had the "primary responsibility" for convicted felons. Tex.Rev.Civ. Stat. Art. 4413(401) § 1.02. In the opinion, the *Alberti* court also transferred the third-party complaint and the supplemental complaint to the *Ruiz* court.

On October 11, 1989, the county moved to supplement or amend the September 25, 1989, findings of fact and conclusions of law and, alternatively, for a new trial. The *Alberti* court denied the motion on October 23, 1989. Shortly thereafter, both the county and the state filed protective notices of appeal. This court dismissed the appeals as premature on January 3, 1990.

### E. Subsequent remedial orders.

After the transfer to the *Ruiz* court in the September 25 findings of fact and conclusions of law, the *Alberti* and *Ruiz* courts combined to hold joint hearings and issue joint orders on the remedial aspects of the *Alberti* case.[1] The parties at first engaged in settlement negotiations, but when the prospects for settlement dimmed, the combined courts ordered the county

---

1. In an opinion issued shortly after the transfer, Judge Justice described the transfer as partial. Citing *In re Clements,* he stated that:

    It is apparent from the Court of Appeals' opinion that the *Alberti* court retains the power to order certain forms of relief against the State Defendants, so long as that relief does not

    require those defendants to "receive or take prisoners into TDC" or to take other action "in the operation or management of TDC-operated facilities."

    Judge Justice proceeded to direct his special master in *Ruiz* to confer with the *Alberti* special master.

and state to submit proposed remedial plans by January 17, 1990. After the parties submitted their proposed plans, the combined courts held joint hearings on February 27 and 28, 1990.

On March 15, 1990, the combined courts entered a joint remedial order, directing the county and state to reduce the jails' population to 6700 upon entry of the order and to 6100 by August 31, 1990. The order contained a number of additional provisions, addressing among other matters a reduction in the population of ready-felons, the development of alternatives to incarceration, and releases of prisoners in the event of non-compliance.

After the parties moved the combined courts to alter or amend the order, the courts vacated the March 15 order and replaced it with a second order, *nunc pro tunc*, on April 5, 1990. The April 5 order directed the county and state to reduce the jails' population to 6700 upon entry of the order, to 6400 by May 15, 1990, and to 6100 by August 31, 1990. The order specifically required the state to remove 9130 ready-felons between February 1 and August 31, 1990. The state complied with this aspect of the order. Like the March 15 order, the April 5 order provided for the development of alternatives to incarceration and, in addition, directed releases of prisoners in the event of non-compliance. The combined courts denied the parties' motions to alter or amend the order, or for a new trial, on April 25, 1990.

The April 5 order proved effective in reducing the jails' population. By August 13, 1990, the total population stood at 6097, or 130% of design capacity, and the population of ready-felons had dropped to 1069. The renovation of the old central jail at 301 San Jacinto, completed in December of 1989, had increased the combined design capacities of the county's jails to 4698.

Upon the expiration of the April 5 order, the combined courts issued a third joint remedial order on September 7, 1990. In the order, the courts purported "to bridge the next 12 months" until the completion of the new facility at 701 San Jacinto, designed to house an additional 4000 prisoners. The order first required the county to occupy the new facility by September 1, 1991, and provided for "a substantial daily fine for each day beyond September 1, 1991 they fail to occupy the 701 Building." The order further directed the county and state to reduce the jails' population to 6100 upon entry of the order and to 6000 by December 31, 1990, capping the ready-felon population at 1350 and the remaining population at 4751, to be reduced to 4650 by December 31, 1990. Again, like the earlier orders, the September 7 order provided for the development of alternatives to incarceration and directed releases of prisoners in the event of non-compliance.

Pursuant to the September 7 order, the *Alberti* court issued four orders directing the release of 254 pretrial and convicted misdemeanants on September 14, 17, and 18, 1990. Both the county and the state appealed this order. The state obtained a partial stay of the order from this court on September 21, 1990. We later withdrew the stay on the understanding that, first, the combined courts would not release felons without sufficient notice for application by the parties for further stay and, second, that the parties would work together "to obtain a process that will protect the public safety and the integrity of the criminal justice system as well as the rights of prisoners."

Prior to the releases, the county and state had moved the combined courts to alter or amend the September 7 order, or alternatively, for a new trial. The *Alberti* court set a hearing for October 22, 1990, and ordered the defendants to submit new proposed remedial plans. The court specifically announced that the alternatives to be considered at the hearing would include "(1) temporary housing and the expense and time necessary for the construction thereof and (2) the utilization of facilities of nearby counties which may have available jail space." After the hearing, the court concluded that the county and state had "not yet developed a feasible strategy for addressing the overcrowding problem in Harris County detention facilities that precludes the need for further releases of in-

mates, although elements of a possible solution surfaced." The court accordingly directed the defendants to meet with the monitors in the *Alberti* and *Ruiz* cases and "to jointly develop an acceptable plan for dealing with the short-term population crisis in Harris County facilities."

On November 19, 1990, the *Alberti* court stayed the releases authorized in the September 7 order, giving the county and state sixty days to implement alternative programs designed to bring the jails' population within the caps set in the September 7 order. The November 19 order also contained a fallback provision; it stated that if the required caps were not met within sixty days, the court would require "the defendants, or either of them ... to contract for the use of private jail cells or empty county jail cells around the State to house excess prisoners."

On February 7, 1991, upon finding that the jails' population still exceeded the caps set in the September 7 order, the *Alberti* court issued a fourth remedial order. Evidencing a growing impatience, the court refused the state's request to further delay implementation of the population caps established in the earlier orders. Instead, the court implemented an alternative remedy pending the opening of a boot camp in April of 1991 and the new facility at 701 San Jacinto in September of 1991. The order first directs the county and state to reduce the jails' population to 6300 within 45 days. County prisoners, including felons not ready for transfer, are not to exceed 4725 (75% of capacity), and ready-felons are not to exceed 1575 (25% of capacity). If necessary to meet the population caps, the order directs the county sheriff to transfer ready-felons to facilities in other counties. The state is required to deposit $750,000 with the *Alberti* court's registry by March 20, 1991. The order authorizes the county to pay up to $40 per day for the housing of each transferred prisoner; the expenditures are to be reimbursed by the state's deposit to the extent that ready-felons exceed the 1575 cap.

Unlike the previous remedial orders, the February 7 order was not a product of the combined courts. Instead, Judge Justice wrote separately "to clarify my relationship to the relief set forth." Although he conceded that the order was within the scope of *Alberti*, he suggested that the requirement that the state deposit $750,000 "seemingly falls within the purview of *Ruiz*" and stated that he "would abstain" from deciding whether, under Texas law, the state was obligated to pay costs incurred by the county in housing ready-felons in other counties' facilities.

Both the county and state filed motions to modify the February 7 *Alberti* order. The state also filed a motion to vacate the order and a notice of appeal. While the motions to vacate were pending, the state petitioned for a writ of mandamus from this court, asking that we vacate the portion of the February 7 order requiring the state to deposit $750,000 and, in addition, either enforce or modify our previous decision in *In re Clements*. Alternatively, the state requested a stay of the portion of the order requiring the $750,000 deposit, a writ of prohibition, summary reversal, or certification to the Texas Supreme Court.

On March 15, 1991, the *Alberti* court slightly modified the order and denied the motions to vacate or stay the order. The county and state then filed new notices of appeal. On March 21, 1991, this court similarly denied the state's request for a stay of the portion of the order requiring a $750,000 deposit. The Supreme Court temporarily stayed the provision the same day, but on April 1, 1991, withdrew the stay. The state and county now appeal the September 25 findings of fact and conclusions of law and each of the subsequent remedial orders.

II.

The county and the state initially offered little resistance to the assertion that excessive overcrowding in the county's jails renders the conditions of confinement for the plaintiff class unconstitutional. While this appeal was pending, however, the Supreme Court held in *Wilson v. Seiter*, —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), that the Eighth Amendment "man-

date[s] inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." In supplemental briefs to this court, each defendant argued that only the other acted with the requisite intent.

Even after *Seiter*, then, the heart of the appeal remains the relative responsibilities of the state and county. The county believes that the state should shoulder full responsibility, as the overcrowded conditions have resulted largely from the huge backlog of ready-felons. The state, on the other hand, contends that state law places full responsibility for the jails on the county. In formulating its remedial orders, the *Alberti* court faced the difficult task of remedying the constitutional violation without intruding on the state's right, as a sovereign, "to decide who will be held liable for civil rights violations that occur in the course of carrying out [state powers]." *Bush v. Viterna*, 795 F.2d 1203, 1209 (5th Cir.1986). We believe the balance was well struck by the *Alberti* court. However, we vacate and remand the liability findings against the state and the county to allow the *Alberti* court to consider the effect of *Seiter*. Before addressing the liability and remedial issues, we turn to two jurisdictional issues.

### A. *Jurisdictional issues:*

#### 1. *The expired remedial orders.*

■ The first three remedial orders, issued on March 15, April 5, and September 7, are now expired. The county argues that the orders are still appealable, however, because the issues presented by the orders are "capable of repetition, yet evading review." *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). We took this position in an order denying the state's motion to dismiss the county's appeal of the first remedial order as moot but noted that, upon further consideration, the oral argument panel might find the appeal moot. The plaintiffs contend that the first

two remedial orders are moot even under *Bell* because the latest order, issued on February 7, 1991, expressly "superseded" them. However, we continue to find the county's characterization convincing. *See National Wildlife Federation v. Castle*, 629 F.2d 118, 123–24 n. 19 (D.C.Cir.1980).

#### 2. *The medical care findings.*

■ In its September 25 findings of fact and conclusions of law, the *Alberti* court suggested that the medical conditions in the county's jails constituted an independent constitutional violation.[2] However, none of the remedial orders specifically address medical care. The plaintiffs contend that the county's challenge to the medical care findings is thus premature. We agree with the plaintiffs, but not fully with their characterization of the relevant jurisdictional defect. There has been no final judgment in the *Alberti* case, and the state and county are thus appealing the remedial orders under 28 U.S.C. § 1292(a)(1). As medical care has not yet been implicated in a remedial order, the related findings are outside the § 1292(a)(1) exception to the final judgment rule.

### B. *Liability issues:*

#### 1. *The relative obligations of the state and the county.*

■ The starting point in evaluating the relative obligations of the state and the county is *Bush v. Viterna*, 795 F.2d 1203 (5th Cir.1986). In *Bush*, a class of county inmates brought an action under § 1983 to compel a newly created state commission, the Texas Commission of Jail Standards, to discharge its state law duties. The authorizing statute required TCJS to establish minimum standards for county jails and to review reports of noncompliance. Additionally, the statute gave TCJS discretionary enforcement powers. The plaintiffs urged a "supervisory liability" theory, suggesting that TCJS legally caused constitutional wrongs that it failed to prevent or

**2.** The *Alberti* court found that the poor level of medical care reflected "conscious indifference towards the inmates' serious medical needs." Under *Seiter*, 111 S.Ct. at 2321, and *Estelle v.*

*Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), this finding alone establishes an Eighth Amendment violation.

correct. In rejecting the plaintiffs' theory, we reasoned that Texas law identifies county sheriffs and commissioners courts, not TCJS, as keepers of the county jails. *Id.* at 1206. *Bush* thus concluded as follows:

> [A]ccepting for now the concept that the breach of a state-imposed duty can cause a constitutional tort, we hold that the necessary causal relationship is absent when a state duty to regulate, monitor, inspect, or advise is not accompanied by an obligation to extirpate constitutionally substandard conditions or activities that may be encountered.

*Id.* at 1208.

Particularly relevant to this appeal is the final section of *Bush*, where we explained "the different roles that state and federal law inevitably play in the analysis of constitutional torts." *Id.* at 1208. Whenever a plaintiff alleges a cause of action under § 1983, a federal court must ask three questions. First, is a federally secured right affected? In some cases, particularly procedural due process cases, the federal court must look to state law to answer related threshold questions, such as "whether the claimant in fact had a property right in whatever it was that was taken away from him," but the right itself is defined by federal standards. *Id.* at 1209. Second, was the alleged deprivation of the right accomplished by state action? Here again, some reference to state law is necessary, but "the definition of state action is ultimately a question of federal law." *Id.* Finally, who is the state actor responsible for the violation? Unlike the first two questions, the third question turns *exclusively* on state law. "The states have virtually complete freedom to decide who will be responsible for such tasks, and therewith to determine who will be held liable for civil rights violations that occur in the course of carrying them out." *Id.*

The hard question in this appeal is the third question, the issue of who is liable for the conditions in the county's jails. The county clearly has some responsibility for the conditions in its own jails. Texas law requires the county's commissioners court to provide "safe and suitable jails" and makes the county's sheriff "keeper of the county jail." Tex.Local Govt.Code §§ 351.-001 and 351.041. The county does not deny these obligations; rather, it argues that the objectively cruel conditions in its jails have resulted solely from the state's backlogging of ready-felons. For reasons discussed more fully below, *Seiter* gives some new fuel to the county's argument.

By contrast, the state denies any responsibility for the conditions in the county's jails. The *Alberti* court twice rejected the state's contention that Texas law makes the county solely liable, first in an order denying the state's motion to dismiss the county's third-party complaint and again in its September 25 findings of fact and conclusions of law. The court distinguished *Bush* because "[i]n contrast to the Texas Commission of Jail Standards, Third–Party Defendants have a state and constitutionally imposed duty to provide appropriate conditions of confinement for the approximately 3500 convicted felons currently incarcerated in the Harris County Jails." In support of this conclusion, the court cited *Stewart v. Winter*, 669 F.2d 328 (5th Cir. 1982), a remarkably similar case.

In *Stewart*, a class of inmates housed in Mississippi county jails brought an action against both county and state officials under § 1983 to challenge the conditions of the jails. The district court granted the state's motion to dismiss on the ground that the state had no authority over the county's jails. On appeal, however, this court held that the district court erred in dismissing the claims against the state. We reasoned as follows:

> Several of the named plaintiffs, and thousands of the putative class members, are state prisoners committed to the custody of the Mississippi Board of Corrections. The district court's holding would allow the defendant state officials to relegate their prisoners to "cruel and unusual punishment" so long as they have no power to change the conditions of confinement in county jails. We reject this theory. This court has consistently held that state officials cannot disclaim responsibility for cruel and unusual conditions of confinement of prisoners in their

custody on the ground that it is beyond their power to effect the changes necessary to bring the conditions up to minimal standards. [citations omitted] Even if the district court were correct in deciding that the defendant state officials have no authority to make changes in county jails, the district court could have ordered the state officials to remove prisoners in their custody from any county jail found constitutionally inadequate, or, in the alternative, offered them the opportunity to assist the county in making the necessary changes in order to continue using the jail to incarcerate state prisoners.

*Id.* at 332.

*Benjamin v. Malcolm*, 803 F.2d 46 (2d Cir.1986), and *Tate v. Frey*, 735 F.2d 986 (6th Cir.1984), like *Stewart*, involved essentially identical situations. In *Benjamin*, after city inmates brought a § 1983 challenge to the conditions in New York City jails, the city moved to join the state of New York as a third-party defendant. The city contended that the overcrowding in its jails resulted from the state's failure to accept convicted felons as required by state statute:

> When a sentence of imprisonment is pronounced, or when the sentence consists of a fine and the court has directed that the defendant be imprisoned until it is satisfied, the defendant must forthwith be committed to the custody of the appropriate public servant and detained until the sentence is complied with.

N.Y. Criminal Procedure Law § 430.20. The district court granted the city's motion and directed the state to accept felons within 48 hours from the completion of transfer processing.

On appeal, the Second Circuit rejected the state's *Pennhurst* argument and affirmed the order joining the state. Its opinion echoes of *Stewart:*

> [P]risoners whom [the state] refuses promptly to accept into its prisons are not those of some other state, county, or planet, but its own prisoners who have been convicted by New York State courts of New York felonies. The State cannot therefore wash its hands of its *federal constitutional responsibility* for the detention conditions of such prisoners because they are temporarily housed in City facilities or because a New York statute requires the State to accept them "forthwith."

*Id.* at 51 (emphasis in original).

In *Tate*, after county inmates brought a § 1983 challenge to the conditions in Jefferson County jails, the county filed a third-party complaint against the state of Kentucky. The state had adopted a "controlled intake policy" pursuant to a consent decree in litigation involving its own prisons, and in accordance with the policy, refused to timely accept felons in the county's jails awaiting transfer to state prisons. After finding that the overcrowded conditions in the county's jails were caused in part by the state's policy, the district court issued an order directing state officials to reduce the number of felons in the county's jails by transferring felons to a state prison within thirty days of sentencing.

On appeal, the state argued that the district court erred in allowing the third-party complaint. The Sixth Circuit affirmed, finding a "substantive basis" for the claim in a state statute:

> When an indeterminate term [1 year or more] of imprisonment is imposed, the court shall commit the defendant to the custody of the bureau of corrections for the term of his sentence and until released in accordance with the law.

Kentucky Revised Statute § 532.100. An accompanying commentary states that § 532.100 "assures that felony offenders, once convicted and sentenced to imprisonment, *shall* be delivered to the Department of Corrections, with the specific place of incarceration to be left to the Department." As the case involved a preliminary injunction, the Sixth Circuit reviewed the district court only for abuse of discretion. But the Sixth Circuit rejected the state's *Pennhurst* argument, affirming the district court's finding that the state was partly responsible for the unconstitutional conditions in the county's jails.

The state's attempt to distinguish *Benjamin* is without merit. The state argues that the result in *Benjamin* turned partly on the fact that New York's refusal to accept convicted felons made it "impossible for the city to comply with the district court's judgment against it in the plaintiffs' favor." The state then cites *Badgley v. Vareles*, 729 F.2d 894, 901 (2d Cir.1984) for the proposition that, if complete relief can be obtained from the county, then there is no right to an order against the state. The real difference between *Benjamin* and *Badgley*, however, was that in *Badgley* New York was not adjudicated a constitutional violator. *See Benjamin*, 803 F.2d at 52.

The state's reliance on *Bush* is thus misplaced unless the Texas scheme is significantly different from the schemes in Mississippi, New York, and Kentucky. In its September 25 findings of fact and conclu-sions of law, the *Alberti* court reasoned that the state was jointly liable for the unconstitutional conditions in the county's jails because, although the sheriff is the keeper of the jail, the state is responsible for the confinement of convicted felons under Tex.Pen.Code §§ 12.31–12.34 and Tex. Code Crim.Pro. Art. 42.09. Before the 1989 amendments, continued the court, the transfer of convicted felons was governed by the interplay between Tex.Code Crim. Pro. Art. 42.09 and Tex.Gov.Code § 499.006—§§ 1 and 4 of Art. 42.09 envisioned "at least a temporary stay at the jail when a felon does not appeal his conviction or when a felon appeals his conviction but his sentence is for a term of ten years or less," while § 499.006 provided for a "safe and speedy" transfer to a state facility.[3]

Although the 1989 amendments deleted the requirement of a "speedy" transfer and authorized the adoption of the scheduled

---

**3.** The relevant Texas provisions are as follows:

1. *Tex.Pen.Code Ch. 12 (punishments) §§ 12.-31–12.34 (ordinary felony punishments):*
   These provisions state that individuals adjudged guilty of a capital felony, first-degree felony, second-degree felony, or third-degree felony "shall be punished by confinement in the Texas Department of Corrections."

2. *Tex.Rev.Civ.Stat. Art. 4413(401) (Department of Criminal Justice) § 1.02 (responsibilities):*
   This provision states that the Department of Criminal Justice has "primary responsibility for (1) the confinement, supervision, and rehabilitation of felons."

3. *Tex.Code Crim.Pro. Ch. 42 (judgment and sentence) Art. 42.09 (commencement of sentence, delivery to place of confinement):*
   Section 1 states that, except as otherwise provided, the defendant "shall be delivered to jail or to the Department of Corrections when his sentence to imprisonment is announced." If the defendant is convicted of a felony and sentenced more than ten years, and he gives notice of appeal, § 3 states that he "shall be transferred to the Department of Corrections on a commitment pending a mandate from the court of appeals or the Court of Criminal Appeals." If, on the other hand, he is convicted of a felony and sentenced less than ten years, and he gives notice of appeal, § 4 states that he shall only be transferred to the Department of Corrections upon his request. *See Ex parte Rodriguez*, 597 S.W.2d 771 (Tex. Cr.App.1980). None of the provisions specify the proper course *absent* an appeal. Finally, § 8 states that the Department of Corrections "shall not take a defendant into custody" until it receives specified documents from the county.

4. *Tex.Code Crim.Pro. Ch. 104 (certain expenses paid by state and county) Art. 104.002 (expenses for prisoners):*
   This provision states that "a county is liable for all expenses incurred in the safekeeping of prisoners confined in the county jail or kept under guard by the county." It also provides for inter-county (but not state-county) reimbursements.

5. *Tex.Gov.Code Ch. 494 (Texas Department of Corrections—contracts):*
   Adopted as part of the 1989 amendments, this chapter authorizes the Board of Corrections to contract with a private vendor *or a county* commissioners court for jail space. *See* § 494.001. A private vendor or county under contract with the Board has no authority to compute parole or release dates, award good time, approve furloughs, or reclassify inmates. *See* § 494.004.

6. *Tex.Gov.Code Ch. 499 (miscellaneous matters) Art. 499.006 (transportation of inmates):*
   Before its 1989 amendment, this provision stated that the director of the Board of Corrections "shall adopt rules to provide for the safe and speedy transfer of inmates from the counties in which inmates are sentenced to the department." Now the provision states that the director "shall make suitable provision and regulations for the safe transportation of prisoners from counties where sentenced to the State penitentiary."

7. *Tex.Local Gov.Code Ch. 351 (jails and law enforcement) § 351.041 (sheriff):*
   This provision makes the sheriff of each county "the keeper of the county jail."

admissions policy, the *Alberti* court concluded that the amendments did not relieve the state of its responsibility for the confinement of convicted felons:

> The State of Texas is free to allocate the admissions of felons into the penitentiary in virtually any manner it chooses so long as the allocation does not result in the cruel and unusual punishment of inmates. However, when it becomes clear that convicted felons are being confined in conditions that violate the Eighth Amendment, the relevant inquiry becomes who is responsible for those inmates. Fortunately, H.B. 2335 [the 1989 amendatory act] provides a clear answer to this inquiry. Section 1.02(a)(1) provides, "The department [TDCJ, formerly TDC] is the state agency with *primary* responsibility for ... the confinement, supervision, and rehabilitation of felons." Thus, the fact that the State of Texas has "virtually complete freedom to decide who will be responsible" for the confinement of felons provides no shield from liability for the State Defendants in this case because state law clearly places

the primary responsibility for the confinement of felons upon them. *See Bush v. Viterna,* 795 F.2d 1203, 1209 (5th Cir. 1986).

The *Alberti* court's reasoning is consistent with that of the only state court to have addressed the issue. After the 1989 amendments, Nueces County and Harris County both filed suit in Travis County, contending that the state still had the responsibility either to promptly remove ready-felons or to reimburse the counties for the costs of their housing. In both cases, the state court ruled for the county on the merits; one case is now on appeal, and the other still before the district court on damages issues. *County of Nueces v. Texas Board of Corrections,* No. 452,071 (Dist.Ct. of Travis County, 126th Judicial Dist. of Texas 1991); *Harris County v. State of Texas,* No. 465,468 (Dist.Ct. of Travis County, 126th Judicial Dist. of Texas, pending).[4] Since our task, as set forth in *Bush,* is to decide who is liable for the violation under *state* law, we find it appropriate to defer to the state courts on the issue.[5]

---

4. The reasoning of the state court is best laid out in a letter from the judge to the parties dated May 31, 1990. The court reasoned that the statutory provisions placing responsibility for felons with the state were quite clear. Tex. Pen.Code §§ 12.31–12.34; Tex.Crim.Pro.Code Art. 42.09; Tex.Gov.Code § 499.006. On the other hand, the provision cited by the state, the scheduled admissions policy, was ambiguous. "It neither expressly relieves the state of the duty to take and confine felons nor expressly places that duty on the counties." The court was also influenced by the awkward effects that, in its opinion, the state's interpretation would have:

> 1. H.B. 2335 which places "primary responsibility" for the confinement, supervision and rehabilitation of felons on the Texas Department of Criminal Justice will be rendered meaningless. [citations omitted]
> 2. The statutes cited above which unambiguously require that TDC confine felons will, in effect, be repealed.
> 3. The portions of the court orders which sentence felons to TDC will be meaningless.
> 4. New duties will be placed on the counties which they have never had before, possibly in violation of Article 5, § 18(b) of the Texas Constitution. Conversely, the State will be relieved of duties clearly placed on it by statute.

5. The taxpayers of the affected counties will have to shoulder a tremendous financial burden which under the unambiguous statutes should be borne by the whole state.

The court also noted that a bill relieving the state of financial responsibility for felons left in county jails was introduced, but failed to pass.

As the county points out, the state is a party to both *County of Nueces* and *Harris County.*

5. We find no merit in several related arguments urged by the state. For example, the state argues that, under the supremacy clause, "any such state-law duty to accept inmates more speedily (if it ever existed) must give way to orders entered by the federal district court in *Ruiz."* The *Alberti* obligation arises from the Eighth Amendment. The consent decree in *Ruiz* must give way to its demands. At any rate, the *Alberti* court specifically found that the state "could have complied with the requirements of the *Ruiz* decree without refusing to accept prisoners."

The state also makes several intent arguments. First, the state points out that "the Very Legislature that passed § 1.02 [stating that the state has "primary responsibility" for felons] failed to enact any appropriations that would enable State Defendants to assume responsibility for the care or treatment of convicted felons in local jails." This argument fails to explain the contemporaneous passage of Tex.Gov.Code § 494.001, authorizing the state to contract for

### 2. The deliberate indifference requirement.

■ Our conclusion that state law imposes responsibilities on both the state and the county does not end our inquiry. At the time of the liability hearings before the *Alberti* court, the focus of the parties and the court was on the objective conditions of confinement in the county's jails. *See Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). This circuit had earlier held that "unlike 'conduct that does not purport to be punishment at all' as was involved in *Gamble* and *Whitley*, the Court has not made intent an element of a cause of action alleging unconstitutional conditions of confinement." *Gillespie v. Crawford*, 833 F.2d 47, 50 (5th Cir.1987) (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)), vacated on other grounds, 858 F.2d 1101 (5th Cir.1988). Both the county and the state expressly conceded that excessive overcrowding rendered the conditions of confinement in the county's jails unconstitutional, and each attempted to persuade the court that the other should shoulder full responsibility.

While this appeal was pending, however, the Supreme Court held that prison conditions rise to the level of cruel and unusual punishment only when they are a product of state indifference. In *Wilson v. Seiter*, — U.S. —, —, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991), the Court identified the source of this subjective requirement as "the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element

must be attributed to the inflicting officer before it can qualify." In prison conditions cases, like *Alberti*, the requisite intent is "deliberate indifference" as articulated by the Court in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *Id.* — U.S. at —, 111 S.Ct. at 2326.[6]

The deliberate indifference requirement of *Seiter* and *Estelle* is not wholly separate from the objective requirement of *Rhodes*. In *Seiter*, the Court explained that the "long duration of a cruel prison condition may make it easier to *establish* knowledge and hence some form of intent." *Id.* at —, 111 S.Ct. at 2325. Several lower courts, cited in *Seiter*, have found deliberate indifference where prison officials were aware of objectively cruel conditions but failed to remedy them. *See Cortes–Quinones v. Jiminez–Nettleship*, 842 F.2d 556, 560 (1st Cir.1988); *Morgan v. District of Columbia*, 824 F.2d 1049, 1063 (D.C.Cir. 1987). In *Alberti*, there is little doubt that both the county and the state knew that the conditions of confinement in the county's jails deprived the inmates of basic needs. The county's jails had been under the continuing jurisdiction of the *Alberti* court since 1975, the monitors' reports became increasingly strident after mid–1988, and both the county and the state expressly admitted that the conditions of confinement were objectively unconstitutional during the liability hearings.

In deciding whether the county and the state were deliberately indifferent to the needs of the plaintiffs, however, we must also consider any relevant constraints. As Justice Scalia explained, "whether [conduct] can be characterized as 'wanton' depends upon the constraints facing the official." *Seiter*, — U.S. at —, 111 S.Ct. at 2326. *LaFaut v. Smith*, 834 F.2d 389 (4th

---

jail space with private vendors or counties. Second, the state contends that the Legislature rejected three bills to compensate states for holding ready-felons. But, as the county points out, these "proposed" bills never even reached the floor for a vote.

**6.** In *Seiter*, the Supreme Court stated that, in emergency situations, the requisite intent rises to "acting 'maliciously and sadistically for the purpose of causing harm.'" *Seiter*, — U.S. at —, 111 S.Ct. at 2321. The state argues that we

should apply this higher standard because of a purported clash between the state's responsibility to ready-felons in the county's jails and its responsibilities under the *Ruiz* decree. We think it clear, however, that the Court was concerned with short-term emergencies where prison officials must act "in haste, [and] under pressure." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)).

Cir.1987), written by former Justice Powell and cited extensively in *Seiter*, is instructive. In *LaFaut*, a paraplegic prisoner alleged that prison officials had denied him adequate toilet facilities and necessary physical therapy in violation of the Eighth Amendment. In reviewing the district court's findings, Justice Powell noted that, although LaFaut specifically informed prison officials that his toilet facilities were inadequate, they made no attempt to modify the facilities for two months and, when their initial attempt failed, waited another month before transferring LaFaut to a cell with adequate facilities. Similarly, although LaFaut repeatedly requested physical therapy and official medical reports confirmed the need for therapy, he waited two months for minimal motion therapy and eight months for a transfer to an institution with adequate therapy.

Justice Powell concluded that, because there was no reason for the delays, the prison officials had been deliberately indifferent to LaFaut's needs:

> There is nothing in the record before us ... to justify the inordinate delays in accommodating appellant's needs in light of the practicality and availability of various solutions. Prison officials should not ignore the basic needs of handicapped individuals or postpone addressing those needs out of mere convenience or apathy. As appellee Hambrick was the responsible official in charge of Butner, and she was fully advised both of the inhumane conditions of appellant's confinement and the failure to provide him with needed therapy we conclude that her neglect constituted "deliberate indifference" and therefore violated the Eighth Amendment.

*Id.* at 394.

The state contends that its actions were not deliberately indifferent but instead necessitated by the *Ruiz* decree and the overcrowding problems in its own prisons. However, the *Alberti* court specifically found that:

> State Defendants could have complied with the requirements of the *Ruiz* decree without refusing to accept prisoners.

Federal authority did not require them to refuse to accept inmates from county jails. The most obvious alternative would have been to timely build new prison facilities. The Court described other alternatives [such as contracts with other suitable facilities or early releases as authorized by the Texas Prison Management Act, Tex.Rev.Stat.Ann. Art. 6184o] in its May 12, 1989 Memorandum and Order.

There is no doubt that the relevant state officials knew that ready-felons were being backlogged despite the objectively cruel conditions in the county's jails. Yet the state chose to leave them in the jails. This is strong if not compelling evidence of deliberate indifference to the plight of these ready-felons, and it is only accented by the alternatives available to the state. As found by the *Alberti* monitors, the state's management of ready-felons in Harris County "in essence ... ignore[d] those state prisoners...." Significantly, the state could have housed prisoners in a variety of ways. Even housing them under conditions of a military bootcamp would not touch the Eighth Amendment. Indeed, a tent city would be far superior to the conditions in the county's jails. The state cannot turn away from the use of such common sense solutions by pointing to the *Ruiz* decree. The district court explicitly found that the decree was no impediment; and in any event, the *Ruiz* decree could not legally impede such plain responses, at least to the extent its constraints were not themselves required by the Constitution.

Nor does this record offer substantial evidence that the state's actions were constrained by legislative refusal to fund the only means by which the state could have relieved the county. Before *Seiter*, it was well established in this circuit that "inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement." *Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir.1980); *see also Gates v. Collier*, 501 F.2d 1291, 1319–20 (5th Cir. 1974). Other circuits have found deliberate indifference over allegations of inadequate funding. *See Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.1986); *Ancata v. Prison*

*Health Services, Inc.,* 769 F.2d 700, 705 (11th Cir.1985); *Wellman v. Faulkner,* 715 F.2d 269, 274 (7th Cir.1983). The issue is assured currency by the intent requirement of *Seiter* and that opinion's leave of it. *See Seiter,* —— U.S. at ——, 111 S.Ct. at 2326. We need not address the issue here in the absence of findings pointing the finger at the legislature. In short, however, this record leaves us skeptical of the assertion that a recalcitrant legislature was the culprit.

We would, by necessity, affirm a finding that the state was deliberately indifferent. Indeed, such a finding on this record would be virtually unassailable. There is understandably no such finding, however, because deliberate indifference was not an issue when the *Alberti* court ruled. As strong as the case is, we are reluctant to conclude that a finding of deliberate indifference is compelled as a matter of law. Factfinding is a province of the district court. We therefore remand for the appropriate findings and leave to the district court the decision to take any further evidence.

■ The county also argues that its actions were not deliberately indifferent after *Seiter.* Again, there is no finding, but here the record offers some evidence of arguably formidable constraints. The *Alberti* court noted in its September 25 findings of fact and conclusions of law that, until the state began refusing ready-felons, "it appeared that a spirit of cooperation between Plaintiffs and County Defendants would eventually lead to full compliance with all Court orders with a minimum of direct judicial intervention." In June of 1987, the county's jails were only five percent over capacity, and the number of ready-felons in the county's jails had regularly fluctuated between 100 and 200 for several years. Upon the state's decision to backlog ready-felons, their numbers quickly jumped to 512 in September of 1987, 798 in December of 1987, 2100 in December of 1988, and 3420, or 45% of the total population of 8086, by the time of the liability hearing in August of 1989.

In light of the increase in the population of ready-felons over such a short period of time, we cannot conclude from the record as it now stands that the county has deliberately ignored the needs of its inmates or that its delay in accommodating the overcrowding has been "inordinate." *LaFaut,* 834 F.2d at 394. By contrast, any increase in the population of state prisoners, including ready-felons, was expressly contemplated by the state. The 95% "crowding stipulation" in *Ruiz,* signed by the state, provides that:

> The parties further acknowledge that certain conditions and eventualities are within the contemplation of the parties. These include the possibility that TDC may experience a substantial increase or decrease in its population....

*See Ruiz v. Lynaugh,* 811 F.2d 856 (5th Cir.1987).

While the huge jump in the population of ready-felons might weigh against a finding of deliberate indifference, other facts could weigh in favor of such a finding. For example, the *Alberti* court found problems with the jails' plumbing, ventilation, fire safety, supplies, food service, and medical care. The *Alberti* court also found that the constitutional capacity of the county's jails equalled their design capacity and that "[e]ven if all TDC-ready prisoners were removed from the jail, the population would still exceed design capacity by approximately 400 inmates." The 1975 consent decree could also factor into the county's liability. We thus remand for the appropriate findings and, again, leave to the *Alberti* court whether it will conduct further hearings or consider additional evidence.

■ Although we do not decide the liability question, one remaining issue is relevant to the remand. The county argues that the *Alberti* court erred in equating the constitutional capacity of its jails with their design capacity. But, in its September 25 findings of fact and conclusions of law, the court expressly recognized its obligation to consider the "totality of the conditions." And its findings contemplate a number of factors in addition to design capacity—the fact that thousands of inmates were sleep-

ing on the floors, the physical design of the cellblocks, the inability of the staff to control the inmates, the increase in disciplinary violations, plumbing problems, poor ventilation, the absence of a sprinkler system or a second means of egress in the event of a fire, supply shortages, insufficient food service, inadequate medical care, and the outbreak of a pneumococcal infection. In sum, then, the finding was not clearly erroneous.

## C. *Remedial issues:*

■ The state's attacks on the remedial orders are all jurisdictional. First, the state argues that the orders violate the Eleventh Amendment because they enforce state law against the state, citing *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), *Bush v. Viterna,* 795 F.2d 1203 (5th Cir.1986), and *Kelley v. Bd. of Educ. of Nashville and Davidson County,* 836 F.2d 986 (6th Cir.1987). The state contends that the county is fully responsible for the conditions in its jails and that any duty the state might have to promptly remove ready-felons arises only under state law. While we agree with the state's premise, we reject its assumption that its duties arise only under state law. As discussed above, in *Stewart,* 669 F.2d at 333, a case involving a challenge to overcrowded conditions in Mississippi county jails, this court found the state partially responsible for the unconstitutional conditions because "state officials cannot shed their constitutional obligations by putting state prisoners in county jails." *Accord Benjamin,* 803 F.2d at 46; *Tate,* 735 F.2d at 986. Although *Stewart* predated *Pennhurst,* both *Benjamin* and *Tate* rejected *Pennhurst* arguments in identical situations. As reasoned by the Second Circuit:

This argument [*Pennhurst*] must be rejected, however, for the reason that the prisoners whom [the state] refuses promptly to accept into its prisons are not those of some other state, country, or planet, but its own prisoners who have been convicted by New York state courts of New York felonies. The State cannot therefore wash its hands of its *federal constitutional responsibility* for the detention conditions of such prisoners because they are temporarily housed in City facilities or because a New York statute requires the State to accept them "forthwith."

*Benjamin,* 803 F.2d at 51 (emphasis in original). In sum, because the state is responsible for ready-felons, *Pennhurst, Bush,* and *Kelley,* are distinguishable.[7]

■ The state also urges that the orders violate the Eleventh Amendment because they exact monetary rather than prospective relief. Like the *Pennhurst* argument, however, this contention mischaracterizes the orders—the plaintiffs established a federal constitutional violation, and the state is a responsible party. The required payments are thus "a necessary consequence of compliance in the future with a substantive federal-question determination." *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974); *see also Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Williams v. Edwards,* 547 F.2d 1206, 1212–13 (5th Cir.1977); *Jenkins v. Missouri,* 807 F.2d 657 (8th Cir.1986), *rev'd in part on other grounds,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *Kelley,* cited extensively by the state, is distinguishable—the order remedying the violation in *Kelley* ran only against the county, and the state was not a current constitutional violator, yet the county sought reimbursement from the state for the costs of the remedial order. *See Kelley,* 836 F.2d at 990–94.[8]

---

7. In *Kelley,* cited extensively by the state, Tennessee was not a present constitutional violator when the order against it was entered. *See Kelley,* 836 F.2d at 989–90, 993–94.

8. The state also makes a general federalism argument, suggesting that "[a] federal court has no jurisdiction (no power) to act as arbiter between different levels of a State's government

that are in dispute." Again, this argument mischaracterizes the action; the state is responsible for a federal constitutional violation. Unless the plaintiffs were to be left with no remedy, the *Alberti* court had to apportion liability between the state and county. The relevant federal question, then, is the Eighth Amendment issue; the

■ Finally, the state argues that the *Alberti* court should have abstained from ordering it to pay for the housing of ready-felons in other county's jails pending the ultimate resolution of the state litigation, discussed above. *County of Nueces v. Texas Board of Corrections*, No. 452,071 (Dist.Ct. of Travis County, 126th Judicial Dist. of Texas 1991); *Harris County v. State of Texas*, No. 465,468 (Dist.Ct. of Travis County, 126th Judicial Dist. of Texas, pending). But none of the abstention theories cited quite fit the facts of *Alberti.* The *Alberti* court has already decided the federal issue; the state issue implicates only the remedy. Moreover, in resolving the state issue, the *Alberti* court simply adopted the approach of the only state court to have decided the issue pending a decision by a higher state court. *See County of Nueces*, No. 452,071 (holding that the state must compensate the county $40 per day for each ready-felon left in the county's jails more than seven days after sentencing).

In sum, the state courts should eventually determine whether the state or the county is responsible for ready-felons in the county's jails. The *Alberti* court's assessment of costs was "tentative" and "contingent on ... the outcome of pending litigation in State courts over the allocation of costs for maintaining felons ready for transfer to the TDCJ–ID in county facilities." The issue, then, is whether the state or the county should pay for the housing of ready-felons in other county jails pending the resolution of the state litigation. If the state is found liable on remand, plaintiffs are entitled to their long-awaited remedy. The state's arguments seem to assume that the county should pay all housing costs until the state courts decide otherwise. But the presumption is baseless. Assuming the findings of state liability, the *Alberti* court chose the best available course in modeling relief on *County of Nueces.*

Because the liability findings against the county are far more problematic, we do not address the remedial issues raised by the county.

dispute between the state and the county impli-

D. *Procedural issues:*

1. *The jurisdiction of the Alberti court to unilaterally impose the February 7 order.*

■ The state does not argue, as it did in an earlier request for mandamus, that the February 7 order violates our opinion in *In re Clements*, 881 F.2d 145 (5th Cir. 1989). Instead, the state contends that the *Alberti* court was without jurisdiction to unilaterally impose the order because, in its September 25 findings of fact and conclusions of law, the *Alberti* court transferred both the county's third-party complaint and the plaintiff's complaint against the state to the *Ruiz* court. In *In re Clements*, we transferred to the *Ruiz* court

> so much of the *relief* portion of the third-party complaint as seeks an injunction ordering our individual petitioners (in their official capacities) to receive or take prisoners into TDC confinement or to otherwise take action in the operation or management of TDC-operated confinement facilities.

*In re Clements*, 881 F.2d at 154. The September 25 transfer by the *Alberti* court was arguably broader than required by *In re Clements;* upon finding the state liable, the *Alberti* court

> ORDERED that County Defendants' third-party complaint and Plaintiffs' supplemental complaint are TRANSFERRED to the Honorable William Wayne Justice for proceedings in accordance with the mandamus opinion of the Fifth Circuit of Appeals entered in this case.

The *Alberti* court retreated in its February 7 order, however, where it stated:

> None of the remedial measures encompassed in this order affect the population cap imposed on TDCJ institutions as a result of the various orders and agreements in the *Ruiz* case, nor do they require the supersedence of the statutorily-based allocation formula adopted by the State defendants to protect the integrity of the *Ruiz* orders and agreements.

cates only the remedy.

As evidenced by his separate February 7 *Ruiz* opinion, Judge Justice disagreed.

The cases cited by the state involve inter-district transfers. The plaintiffs contend that an intra-district transfer, by contrast, does not divest the transferor of jurisdiction. They point to the fact that both the *Alberti* and the *Ruiz* courts are a part of the Southern District of Texas and conclude that Judge DeAnda had the jurisdiction to impose the remedy regardless of the transfer. "Jurisdiction is lodged in a court, not in a person." *In re Brown,* 346 F.2d 903, 910 (5th Cir.1965).

We need not address the distinction urged by the plaintiffs because we read the transfer order by the *Alberti* court to transfer only limited jurisdiction to the *Ruiz* court; the later joint hearings and joint orders reflect an intent to *share* jurisdiction over the third-party complaint and supplemental complaint rather than to transfer jurisdiction entirely. In *In re Clements,* we suggested that "minor or indirect" effects on the state's prison system were within the sphere of *Alberti,* and in addition, saved to *Alberti* "plaintiffs' several motions in that case for orders establishing a limit or 'cap' on the number of inmates confined in the Harris County jail facilities (either as a whole or as to individual units)." *In re Clements,* 881 F.2d at 153. These reservations suggest that the February 7 order fell within the realm reserved to the *Alberti* court. Reading *In re Clements* to preclude an *Alberti* order with *any* effect on the state would leave the *Alberti* court powerless to remedy the overcrowding in the county's jails, since ready-felons account for such a large percentage of the jails' population.

### 2. *Procedural due process.*

The state also makes a general due process argument, suggesting that the *Alberti* court erred in issuing the February 7 order without a hearing. Given the large number of hearings held in *Alberti,* it is difficult to take this argument seriously. At any rate, it is clear from the record that the order was the direct product of a hearing held on October 22, 1990. The ordering schedule for the October 22 hearing specifically announced that one of its purposes was to consider "the utilization of facilities in nearby counties which may have available jail space."

### 3. *The order of relief against the Texas Board of Pardons and Paroles.*

The state next argues that the *Alberti* court erred in ordering relief against the Texas Board of Pardons and Paroles because the Board was not named a party to the action. The state emphasizes that, under Texas law, the Board is an independent agency. *See* Tex.Const. Art. IV § 11; Tex.Code Crim.Pro. Art. 42.18 § 1. In 1989, however, the Texas Legislature abolished the Board and transferred its duties to the Department of Criminal Justice, successor to the Department of Corrections. *See* Tex.Gen. & Special Laws 1989, Reg. Sess., Ch. 785 § 1.20. Because the Board of Pardons and Paroles is now part of the Department of Criminal Justice, we find no error.

### 4. *The supplemental complaint.*

Finally, the state argues that the *Alberti* court erred in allowing the plaintiffs to file a supplemental complaint against the state after the liability trials. As the county and plaintiffs point out, however, the state was a party to the action, a third-party defendant, during the trial. The state contends that its trial strategy would have been different had it been an actual defendant, but it does not explain why. Because the state has not sufficiently demonstrated prejudice, we find no error.

### 5. *Pending motions.*

On April 23, 1991, the *Alberti* court entered an order continuing its February 27 order in effect through September 15, 1991. The state moved to vacate the order, and the *Alberti* court denied the motion on May 1, 1991. On May 9, 1991, the state noticed its appeal of the April 23 order and moved this court to consolidate its appeals. The plaintiffs joined the motion to consolidate the appeals, but the county moved the *Alberti* court to vacate the April 23 order on

May 10, 1991, and argued that its motion to vacate rendered the state's appeal of the April 23 order premature. On May 20, 1991, the county conceded that its motion to vacate was untimely under Fed.R.Civ.P. 59(b), noticed its own appeal of the April 23 order, and requested that this court consolidate the appeals. Both the state and the county filed additional notices of appeal after the *Alberti* court denied the county's motion to vacate on June 4, 1991.

On May 28, 1991, the *Alberti* court entered an order requiring the state to deposit an additional $1,000,000 with its registry by June 10, 1991. The state moved to vacate the order on June 3, 1991, demanding an answer by June 4, 1991. On June 5, 1991, when the *Alberti* court failed to "promptly" respond to the motion to vacate, the state moved this court to stay the order, arguing that the *Alberti* court had "effectively" denied its motion to vacate. The state also noticed its appeal of the May 28 order and moved this court to consolidate its appeals. The county opposed the stay, arguing that the state's motion presented the very same issues rejected by this court when we denied the state's motion to stay the February 7 order.

We grant both motions to consolidate the appeals and adopt the briefs already filed. Finally, we grant the motion of the state to consolidate its latest appeal filed on July 10, 1991, and its most recent petition for writ of prohibition docketed under cause number 91–2801 with the above referenced appeals, and to adopt the briefs on file.

In sum, we remand the case for the limited purpose of allowing the district court to enter findings regarding the issue of deliberate indifference, now required by *Seiter*. We leave to the discretion of the district court whether to take additional evidence or conduct any further proceedings in that court regarding this issue. We stay the orders of the district court which are the subject of this appeal, pending the district court's findings regarding deliberate indifference. The stay will abide the district court's findings on the issue, vacating automatically, and without the need of a further order of this court should the district court find that the state was deliberately indifferent.

REMANDED.